[No. S052520. May 5, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
DEXTER WINFRED WILLIAMS, Defendant and Appellant.

588

## Counsel

Barry L. Morris, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Janis Shank McLean, Patrick J. Whalen and David A. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**GEORGE, C. J.**—Following the guilt phase of defendant's murder trial, a Fresno County jury found defendant Dexter Winfred Williams guilty of the first degree murder of Miguel Gonzalez (Pen. Code, §§ 187, subd. (a), 189)[1] and determined that in the commission of the offense, he used a deadly weapon. (§ 12022, subd. (b).) The jury found true the special circumstance allegations that the murder was committed in the course of a robbery and in the course of a kidnapping. (§ 190.2, subd. (a)(17)(A), (B).)

The jury also found defendant guilty of the robbery and kidnapping for the purpose of robbery of Miguel Gonzalez and David Bush (§§ 209, subd. (b), 211), and further found that in the commission of these offenses, defendant used a deadly weapon (§ 12022, subd. (b)) and inflicted great bodily injury. (§ 12022.7.) The jury also found defendant guilty of the false imprisonment of Michael and Rosanna Beckham (§ 236) and not guilty of the rape of Rosanna Beckham (§ 261). At the conclusion of the guilt phase, the court determined that defendant had served two prior prison terms. (§ 667.5, subd. (b).)

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Following the penalty phase of the trial, the jury returned a verdict of death. The trial court denied defendant's motion for new trial and motion to reduce the penalty pursuant to section 190.4, subdivision (e), and imposed a judgment of death as well as sentence on the noncapital offenses. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

We affirm the judgment in its entirety.

## I. FACTS

### A. *GUILT PHASE EVIDENCE*

#### 1. *The Prosecution's Case*

##### a. *The events of February 16 to 18, 1991*

On February 16, 1991, defendant, then 29 years of age, and his cousin, Jerry Franklin, arrived in Fresno by Greyhound bus from Northern California. Defendant telephoned the residence of his former wife, Cora Drake, to request transportation to her residence. Cora shared her home, located on North Roosevelt Street in the City of Fresno, with her sons David, then 18 years of age, and James, then 4 years of age.

David Drake answered defendant's telephone call and agreed to give defendant a ride from the bus station to the Drakes' residence. David invited a friend, Michael Beckham, then 21 years of age (who, together with his 19-year-old wife, Rosanna Beckham, was staying at the Drakes' residence), to join him.

David Drake and Michael Beckham took a cab to the bus station, where they met defendant and Franklin and returned with them to the Drakes' residence.

On the afternoon of February 17, 1991, defendant and Franklin began shaping pieces of wax to resemble cocaine rocks so they could sell them as counterfeit drugs. Franklin thereafter suggested that defendant, Michael Beckham, David Drake, and another houseguest, Steve Elias, lure victims into an alley behind the Drakes' residence for the purpose of robbing them.

Michael Beckham offered to pose as a hitchhiker in order to lure homosexual men to drive into the alley, where the others could rob them. Michael Beckham lured one victim as planned and defendant, Franklin, David Drake, and Elias beat him into unconsciousness. Defendant took the victim's wallet, then retrieved various articles from the man's vehicle, including spiked

bracelets, two sets of handcuffs, and a hydraulic jack for a vehicle. Defendant distributed the cash from the victim's wallet and gave Michael Beckham $10. Another victim was approached in the same way but drove off when defendant emerged from the bushes and displayed his genitals.

A third incident occurred at approximately 11:00 p.m. on February 17, 1991, when Michael Beckham lured David Bush into the alley in his vehicle and convinced him to remain there for several minutes. Michael left the vehicle and returned with defendant, who opened the door of Bush's vehicle and began striking Bush on the head with a crescent wrench. Entering the vehicle, defendant pushed Bush onto the passenger seat and continued to strike him with the wrench. Defendant demanded Bush's wallet but was angered to see it contained less than $10.

While continuing to strike Bush with the wrench and threatening to shoot him if he tried to escape, defendant backed the vehicle toward the entrance of the alley, a distance Bush estimated to be approximately 100 feet. Bush escaped from the vehicle and waved down a passing automobile, which initially gave chase to defendant, then turned away. Eventually a neighborhood resident telephoned for emergency assistance for Bush.

Bush suffered a broken nose and facial lacerations. At trial, he identified Michael Beckham as the hitchhiker who initially flagged him down, but in police photo lineups and at trial Bush was unable to identify defendant as his assailant. He testified that the assault on him had dislodged his glasses, leaving him unable to see clearly.[2]

That same evening, David Drake spoke on the telephone with an acquaintance, Kenny Dustin, 18 years of age. David Drake asked Dustin to come to the Drakes' residence because defendant had "[taken] over [the] house." David said he and his younger brother, James, were afraid of defendant.

At Dustin's request, Sara Lowmiller drove Dustin to the Drakes' residence. As she subsequently departed from the residence, Lowmiller saw an African-American man and a White man "scuffling" in the street. The White man, his face bloodied, came to Lowmiller's car window and asked for help. Remaining in her vehicle, Lowmiller followed the African-American man into the alley, thought better of continuing her pursuit, then drove away, returning to

---

[2] Michael Beckham was arrested in connection with his participation in the robbery of David Bush. He ultimately pleaded guilty to grand theft for his role as an accessory in the robbery, and was incarcerated at the time of defendant's trial. He denied that he had been offered any deal in exchange for giving testimony that implicated defendant in the charged offenses. As part of the defense case-in-chief, defendant impeached Beckham's testimony regarding this latter point.

the Drakes' residence. There, she summoned Dustin from the residence with her automobile horn. As she waited for Dustin, she observed the African-American man, whom she previously had seen face her, enter the Drakes' residence.

Lowmiller told Dustin that a person who appeared to be bleeding was being chased in the alley, and asked Dustin to explain what had occurred. Dustin responded that he would explain later, directing her to depart. Lowmiller did not identify defendant as the African-American man she observed that evening. Dustin, however, testified that the African-American man seen by Lowmiller was defendant.[3]

Michael Beckham testified that defendant entered the Drakes' residence late on the evening of February 17, 1991, and gave Michael $10 with instructions to go to a store to purchase alcohol. Angry because defendant had not given him a larger share of the robbery proceeds, Michael—accompanied by Dustin and David Drake—instead used the $10 to purchase rock cocaine, which Michael Beckham and Dustin smoked.

In the early morning hours of February 18, 1991, while Michael Beckham, Dustin, and David Drake were away from the residence, defendant "corner[ed]" Michael's wife, Rosanna Beckham, in the kitchen and attempted to touch and kiss her, then backed her into an empty bedroom, where he removed their clothes. Rosanna, a slight, short young woman, was fearful of defendant, who was much larger and who she knew had served a prison term. She testified that he initiated sexual intercourse with her over her tearful objections, but was interrupted by the ringing of the telephone. Franklin entered the room and told defendant the call was for him. Defendant left the bedroom, and Rosanna ran to the bathroom and dressed.

When Rosanna heard that Michael Beckham, Dustin, and David Drake had returned to the residence, she emerged from the bathroom, entered the bedroom where the others were watching television, and sat down on the bed near defendant. Michael Beckham testified: "I could see [defendant] laying back and my old lady was sitting nervous like this . . . and [defendant's] hands were rubbing on her, and I asked him, I said, 'what are you doing rubbing on my wife?' And my old lady got up and he says, 'I ain't rubbing on your wife.' " Defendant told Michael, "Go fuck yourself." Rosanna, with

---

[3] Dustin's testimony was given at the preliminary hearing. Immediately prior to taking the witness stand at trial, Dustin invoked his Fifth Amendment privilege against self-incrimination. Over defendant's objection on grounds discussed, *post*, the trial court ruled that Dustin's invocation of his privilege against self-incrimination rendered him unavailable as a witness at trial. Pursuant to Evidence Code section 1291, the trial court thereafter allowed the prosecution to read into evidence the testimony given by Dustin at the preliminary hearing.

tears in her eyes, walked into the dining room, followed by Michael; she informed him that she wanted to leave. Michael asked, "what's wrong, what's going on? . . . [W]hat did he do, rape you? And she says—she didn't say nothing."

A few moments later, defendant, accompanied by Franklin, began yelling at Michael Beckham, demanding the $10 Michael had received earlier in the evening. Defendant thereafter struck Michael to the ground and started kicking him. Defendant continued hitting Michael while Rosanna screamed. Defendant told Franklin to silence Rosanna, and each time Rosanna screamed Franklin struck her.

Defendant produced a set of handcuffs (procured during the first robbery), handcuffed Michael Beckham's hands behind his back, and dragged him to the back of the residence. There, in Rosanna Beckham's presence, the beating continued; demanding money, defendant broke one of Michael's ribs and caused other injuries.

Defendant thereafter handcuffed Rosanna's wrists behind her back, and at defendant's request, Franklin tore off her clothes. Defendant grabbed her by the throat and lifted her from the floor. Defendant placed a knife to Michael Beckham's neck and directed him to call his (Michael's) mother for the purpose of obtaining $100. Crying, and bleeding from his mouth and nose, Michael telephoned his parents, begging them for the money. At one point, defendant grabbed the telephone and said Michael owed him $100 for drugs and that he wanted his money. Michael did not know why defendant had increased the debt from $10 to $100. Michael's parents refused the request. When Franklin suggested that defendant desist, defendant replied: "Shut up. I'm in charge of this."

Betty Hills, who also was residing with her son in the Drakes' home at the time, heard Rosanna screaming, initially believing the screams to have emanated from a television horror film. Hills asked defendant why he was hitting Rosanna, to which he replied that she had stolen $40. Hills asked, "if I give you $40, will you stop hitting her and he said yep. So he quit hitting her. . . . I told him I would go prostitute and get him his $40. It would take 20 minutes to get it. I would be right back. . . . He told me that I hadn't stole from him, let that bitch go make the money, she's the one that stole. Talking about [Rosanna]. . . . That I hadn't done nothing to him. So he said [Rosanna] could go make the money."

Rosanna eventually was freed from her handcuffs and directed to dress. Defendant informed her that she would be required to "stand out on the street and pick up guys" in order to obtain money for him, and that if she refused,

her husband would be killed. Although she had never engaged in prostitution, Rosanna agreed. Defendant informed Rosanna that she was to stand in the street, attract customers, and direct them to an alley where she would prostitute herself and thereafter give defendant the money. According to Dustin, Rosanna silently mouthed the words "help me" to him.

Still in the early morning hours of February 18, 1991, defendant, accompanied by Dustin, took Rosanna to Belmont Street, an area known for prostitution. As the two men watched, an automobile pulled over and Rosanna entered it. The driver gave her $5, shortly after which defendant appeared and attempted to kick out the driver's side window. The driver sped away, stopping briefly to release Rosanna. Rosanna gave defendant the $5, and in response defendant informed her that she "only had 95 more to go."

Defendant and Dustin thereafter walked Rosanna back to Belmont Street, whereupon a driver picked her up, took her to his apartment, gave her "a handful of change," and then returned her to Belmont Street a short time later.[4]

Returning to the Drakes' residence, Rosanna saw Michael sitting on the floor, his hands still in handcuffs behind his back. At defendant's command, Rosanna thereafter returned to Belmont Street, where a white Chevrolet Monte Carlo driven by Miguel Gonzalez stopped, and she agreed to perform oral sex for $4. Rosanna directed Gonzalez to the alley, where he parked the automobile. Rosanna exited the vehicle and spoke briefly with defendant. At his direction, she returned to the vehicle to "take care of" Gonzalez. As she began to remove her jacket, defendant threw a hydraulic jack—stolen during the first robbery—through the driver's side window, shattering it and hitting Rosanna in the head. Her head bleeding profusely, Rosanna exited from the vehicle and returned to the Drakes' residence.

Gonzalez emerged from his vehicle and attempted to flee, but defendant tackled him and, according to Dustin's preliminary hearing testimony, defendant then "stomped on the guy's head." Franklin joined in and "[s]tomped on him a couple more times." Gonzalez pleaded for his assailants simply to take his money and leave him alone, and then lapsed into unconsciousness. Defendant took Gonzalez's wallet (eventually giving Dustin

---

[4] Rosanna testified she did not engage in a sexual act at the man's apartment. Her testimony on this point was impeached on cross-examination when defense counsel read her testimony given at the preliminary hearing, during which Rosanna acknowledged having sex at the man's apartment in exchange for $7.

Near the conclusion of the prosecution's case-in-chief, the parties stipulated that during a police interview conducted on February 18, 1991, Rosanna told the investigating police officer that she had sex with the man at his apartment for the prearranged price of $10.

$5) and dragged the victim to the trunk of the car, which Dustin opened with a screwdriver. Defendant and Franklin placed the victim inside the trunk and closed it. Defendant drove the vehicle back to the Drakes' residence, which Dustin and Franklin entered through a back window.

Because Rosanna was bleeding profusely from a cut above her eye, Franklin, Dustin, and David Drake suggested she be taken to a hospital. Defendant initially indicated such a trip was unnecessary, but changed his mind, telling Franklin and Dustin to accompany him and Rosanna to the hospital. While they were driving, Gonzalez began banging the inside of the trunk, pleading to be released. Defendant told Gonzalez to "shut up," then asked the others where they could take him. Dustin testified that, believing defendant simply intended to leave Gonzalez somewhere and not kill him, he (Dustin) suggested they drive to a walnut orchard located behind a residence where Dustin once had resided.

Defendant drove outside of town to the orchard and exited the vehicle with Dustin and Franklin. Rosanna remained in the car. Defendant opened the trunk, hit Gonzalez on the head repeatedly with the hydraulic jack, and then told Dustin to help lift the victim out of the trunk. Dustin did so, dropping Gonzalez to the ground. Defendant resumed beating Gonzalez's head with the hydraulic jack, hitting him at least five or six times. Gonzalez attempted to crawl away, but moved only a few feet before defendant beat his head repeatedly, with a tire rim. Rosanna heard one of the men say, "I think he's dead," and then another voice say, "well, make sure." Dustin watched defendant roll the body over the edge of a five-foot slope.

The three men rejoined Rosanna in the automobile. Dustin asked defendant whether Gonzalez was dead. Defendant replied: "No. He's going to wake up in the morning with a bad headache." Defendant thereafter unsuccessfully attempted to start the car, prompting Dustin to request assistance from a friend who lived nearby. The friend helped start the vehicle, but apparently did not notice Gonzalez's body lying nearby. Franklin suggested they take Rosanna to the hospital, but defendant refused, instead asking Dustin whether he knew where there was a party. Eventually the group drove back to the Drakes' residence, arriving there at approximately dawn on February 18, 1991.

Once inside the house, defendant told Rosanna that the police would arrive soon, so the two of them "had to go back to the bedroom and finish," a comment that Rosanna understood to refer to the sexual assault defendant had

commenced earlier. Defendant took Rosanna to a bedroom, removed their clothes, and had sexual intercourse while Rosanna cried and told him that it hurt.[5]

After speaking by telephone with her son, David, Cora Drake met David and Michael Beckham and called 911 from a nearby convenience store, meeting the responding police officers there.

The police arrived at the residence shortly thereafter. Defendant directed Dustin to stall the police while he climbed out of the back bedroom window. The police had surrounded the residence, however, and defendant immediately was detained. Asked by the police to provide his name, defendant replied it was Ramon Williams. In the ensuing pat-down search, the police recovered from defendant's pants pocket a wallet containing a California identification card bearing the name Miguel Gonzalez. The white Chevrolet Monte Carlo parked in front of the Drakes' residence was registered to Gonzalez; the driver's door window was shattered, and both the outside and the inside of the trunk were stained with blood.

Michael Beckham testified that during a break in the testimony he gave at trial, he made eye contact with defendant, and that defendant mouthed the words, "You're dead, fool," a warning defendant repeated in a subsequent courtroom encounter, informing Michael, "You're dead."

b. *The police investigation*

Fresno Police Department Sergeant Gary Snow testified he encountered Kenny Dustin handcuffed inside a police vehicle parked near the Drakes' residence on February 18, 1991, the morning of defendant's arrest. After advising Dustin of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]), Snow informed him that a person may have been transported in the bloodstained Monte Carlo automobile, and mentioned that the individual possibly still was alive. Dustin initially informed the officer that he knew nothing about a body inside the trunk of the Monte Carlo. After receiving assurances from Snow that his statement would not be repeated to defendant and Franklin, however, Dustin implicated them. He offered to show Snow where the deceased victim was located, and thereafter accompanied Snow to the walnut orchard. There, Snow found the body of Miguel Gonzalez.

---

[5] In an effort to establish that defendant committed the offense of raping Rosanna Beckham, the prosecution presented additional sexual assault evidence at trial. In view of the jury's determination that defendant was not guilty of raping Rosanna, such additional evidence need not be summarized here.

Snow testified that Gonzalez's head "was very distorted because of massive . . . injuries. . . . [I]t was difficult making out facial features because of the extent of the injuries. . . . There were blood spatters. . . . [H]e had brain matter on the ground a short distance from his head. I noticed other blood in the near vicinity of where the victim's body was lying. The victim . . . appeared to have been either rolled or [dragged] down an embankment . . . [and] it looked like a trail of blood where he had either been rolled or [dragged]. . . . I didn't do a detailed crime scene sketch or take detailed notes but I do remember that there was a tire jack near the victim's head and there was a tire rim, chrome rim that was lying a few feet away from the victim's body." Snow requested that homicide investigators be dispatched to the crime scene.

Defendant, Franklin, and Dustin were arrested that morning in connection with the killing of Gonzalez, although Dustin was released shortly thereafter. Defendant had incurred recent injuries to both hands, and dried blood was visible on the palm of his left hand. His shoes appeared to have dried blood on them, as well as dirt embedded in the soles.

### c. *Forensic evidence*

Stephen O'Clair, a senior criminalist employed by the California Department of Justice, testified that blood of a type consistent with that of Miguel Gonzalez (and inconsistent with that of defendant, Jerry Franklin, David Bush, Michael Beckham, and Rosanna Beckham) was found on the tire jack and tire rim discovered at the crime scene, on the rear bumper of the Monte Carlo, on a cardboard carton inscribed "Miller Highlife" recovered from the trunk of the Monte Carlo, in the alley behind the Drakes' residence, at the orchard where Gonzalez's body was found, and on defendant's gloves, pants, and shoes. The blood spatter found on defendant's pants was consistent with having been caused by blows inflicted on the victim with the tire jack.[6]

Dr. Jerry Nelson performed an autopsy on the body of Miguel Gonzalez. Nelson testified that as a result of "multiple blows applied to the face and head," the victim experienced "multiple skull fractures with the bones being pushed into the cranial cast inflicting the lacerations on the brain," and the cause of death was "multiple lacerations or tears of his brain." The victim's face "had a very crushed, inward, flattened appearance. The nose was very flat, as the nasal bones and cartilage were extensively fractured." The victim also suffered "multiple fractures in each of the cheek bones," and at least eight lacerations to the face and head area. Asked to opine whether Gonzalez had experienced a painful death, Nelson testified, "before he lost consciousness, I'm sure that it was very painful."

---

[6] Defendant's body and clothing also bore blood consistent with that of Rosanna Beckham.

Nelson equated the injuries suffered by Gonzalez to those suffered by an individual involved in a head-on automobile collision. He further testified that the injuries suffered by Gonzalez caused him to bleed so profusely "that he bled almost all of his blood out of his body." Nelson added that the victim's injuries were not inconsistent with those that would result from a hydraulic tire jack "forcefully applied," or a tire rim "dropped on somebody."

d. *Defendant's interviews with the police*

After reading defendant his *Miranda* rights (*Miranda v. Arizona, supra,* 384 U.S. 436), Fresno Police Department Detective Tom Sanchez conducted a taped interview of defendant shortly after the latter's arrest on February 18, 1991, and, at defendant's request, conducted a second taped interview on the following day. The prosecution played the audiotape recordings of these interviews for the jury, which also was provided with transcripts of the interviews. Copies of these transcripts are included in the record before us.

During the first interview, Sanchez informed defendant that he was under arrest for murder and that other individuals had placed defendant at the scene of the murder. Although defendant initially declined to provide a statement, and Sanchez terminated the interview, defendant volunteered to speak a few moments later. He thereafter acknowledged having "slapped the shit out of" Michael Beckham and having had consensual sex with Michael's wife, Rosanna, but denied coercing her into prostitution or robbing, beating, or murdering anyone. He claimed the other witnesses falsely had accused him and Franklin, attempting to make scapegoats of them, and characterized their allegations concerning his involvement in the robberies as a "fucking lie." Defendant asserted the injuries to his hands were "old injuries" incurred at a party in Vallejo when "some fool pull[ed] out his knife and I grabbed it."[7]

Defendant acknowledged knowing that Miguel Gonzalez was in the trunk of the Monte Carlo, but denied knowledge of what had happened to Gonzalez thereafter, stating: "I don't know what the fuck happened. . . . I'm going to tell you [the] straight up truth. I don't remember dumping nobody off period." He characterized the interrogating officer's version of the events as "some crazy shit," adding that "I know damn well I didn't do a goddamn thing." Defendant asserted: "I didn't harm anybody. I didn't dump anybody off neither. . . . Me and Jerry are being used for scapegoats, fuck that." Defendant denied touching the hydraulic jack, knowing anything about the tire rim, or driving the vehicle to the orchard. He subsequently recanted the latter denial, stating that when he did exit the vehicle at the orchard, it was

---

[7] During defendant's interview the next day, he explained it was his cousin, Jerry Franklin, who had pulled out the knife; defendant added that he also had injured himself when he "got mad at my Mom's one day and I punched a wall and . . . missed the wall and hit a clock."

only to urinate. He claimed "the only fucking thing I ought to be charged with is joy riding, cause that's the only fucking crime I've committed."

Asked to explain how the victim's wallet came to be located in the pants defendant was wearing when apprehended by the police, defendant denied the pants were his own. He claimed to have been shocked when the police discovered the wallet, adding: "Because, I don't really know if the bitch gave it to me after she got her money from it or not, okay, and see, . . . I am foggy on that right now. . . ." Defendant asserted that the bloodstains on the pants he wore were "[f]rom getting the . . . battery cables."

During the second interview, conducted at defendant's request on February 19, 1991, defendant again generally attempted to deny or minimize his involvement in the crimes. For example, he denied speaking with Michael Beckham's mother on the telephone in an effort to obtain money, denied knowing how Rosanna Beckham received the wound to her forehead, denied wearing gloves on the night the crimes occurred, and again denied knowing how Miguel Gonzalez's wallet appeared in the pants defendant was wearing when the police arrested him.

Defendant portrayed Dustin as a key actor in the crimes: "I don't know if Kenny [Dustin] is trying to turn State's evidence or whatever, you know, I really don't give a fuck because he's implicated worse than anybody else . . . ." Defendant asserted that Dustin took the tire rim from Gonzalez's vehicle, and added that Dustin "was beating the shit out of the guy" with "that fucking mag wheel, you know. And that's where I was saying, man, you know, that's unnecessary."

Defendant asserted that he had been content to leave Gonzalez alive in the orchard and let the victim "walk back to Sacramento," but that Dustin "wanted to knock the man unconscious again and I didn't think all that was necessary. You know, I mean, the man's out there. He's already bleeding. Leave him alone." Defendant described scuffling with Dustin, because the latter was "fucking with the dude [Gonzalez]. I didn't think it was warranted. . . ."

Defendant added, "I didn't commit no motherfucking murder, you know, I may have been there." He called Dustin a liar who was seeking to exonerate himself by blaming defendant, describing him as "a goddamned liar, you know. He wants to keep it off himself, fine. . . . Really can't blame the motherfucker [Dustin] but I know damn well I'm not getting ready to let him just send me down the drain for something I didn't do."

Contradicting the statement he gave during the previous day's interview, defendant acknowledged participating in the robbery of Gonzalez. When

Sanchez stated, "what you're telling me is that you're guilty of everything that's gone on, except for murder," defendant agreed, saying, "I didn't do anything harmful to that man [Gonzalez] other than pulling him out of the car." Defendant added, "okay, yes. I was there. Fuck it. I'm accessory to every one of those fucking robberies."[8]

### e. *Defendant's admissions in his letter to Franklin*

Over defendant's objection, the prosecution read into evidence a letter defendant wrote to Jerry Franklin, seized from the latter's Fresno County jail cell on September 23, 1993. The letter read as follows:

"Young Jay,

"I just got your letter and your words and thoughts made me immediately get back to you. Listen to what I am saying because I'm coming at you with the real. Do not think that you won't see daylight because you will and reassure your woman of this fact.

"From the beginning I was never going to let you go down on this case. I know what needs to be done and the both of us don't need to get stretched out. On my end I'm praying for life without parole. If I get the death penalty I'm hoping that the appeal will give me action. I am not faking myself out, that way I know how to deal with this.

"Jay, you have to testify in order to free yourself. This is how it goes. In the long run you cop to the robbery, I'll take the kidnap, robbery, rape, and murder. Now listen. You really won't be copping to the actual robbery. All you be admitting to is helping Kenny [Dustin] in the alley because he couldn't handle [the] dude. Your testimony pins Kenny for the robbery. I helped and knocked [the] dude out because he was fighting both of you. We helped Kenny put him in the trunk and at first Kenny was going to take us to go party but you and I was scared because the dude was beating on the trunk. Kenny took us out to the field and when me and him was pulling [the] dude out the trunk he got mad, because I dropped [the] dude and he started beating [the] dude with the rim because [the] dude made him look bad in the alley and we had to help him.

"That bitch went with us cause she wanted to. The robberies before David [Drake], Mike [Beckham], and Elias did, we just watched. . . . [T]hat bitch remember that she was at me from the moment we got there and then the

---

[8] Echoing defendant's statements to the police, defense counsel in summation acknowledged defendant was guilty of all the charged offenses except the murder and the alleged rapes.

next night when her husband was gone and it was me, you, her and David, she told you that she liked me but she had never been with a Black man before. But later on you saw us kissing in the kitchen and the bedroom and then when David [Drake] put the handcuffs on you, you walked in the room and saw us and when her husband called, David knocked on the door to warn us that he was coming. There is a whole lot more but as we are going to court, I'll tell you.

"So you see to show that you wasn't involved, you have to testify. Robbery carries three, six, and eight, and you would probably get the six but you'll have almost three in and you won't do no more than a year.

"It is good, that Mary Lou found out the real. Jay, go ahead and marry her now that she knows what time it is[.] [I]f she still wants to be down for you give her what she wants. Tell her to come visit me. I want to let her know that it ain't going to be easy and that she is going to have to be strong during trial and I want to let her know what it will be like being married to someone in the pen. I want to tell her to her face that I ain't going to let you go down on this. I also want to tell her a little about the case so she can understand a little better, plus if she is going to be my cousin, I want to meet her, explain to her why I want her to come up. I need her full name too.

"Jay, I haven't told the lawyers none of the plans and . . . you must remember it's me and you and I know you want to help but I need you out there on the streets. Russ and Cecil aren't looking out for moms and them the way they should so you can't be here with me. If I tell you to roll over on me, don't question what I say, just do it. We won't have time to do a lot of talking.

"Tell Mary Lou to come visit and rush me her name back so I can put her on the list. Stay up. Dex."

### 2. *The Defense Case*

The gravamen of the defense case was to discredit Kenny Dustin's testimony naming defendant as the actual killer of Miguel Gonzalez. Toward this end, the defense presented the testimony of several witnesses who provided evidence that Dustin was dishonest, a White supremacist, a thief, an alcohol and drug abuser, physically and emotionally abusive to his former girlfriend (who testified that she observed Dustin smoke rock cocaine one evening at the time the preliminary hearing was ongoing), and had made out-of-court statements implicating himself in the Gonzalez murder.

With regard to the latter point, Dustin's former girlfriend, Kristi Daffron (who, later in 1991, gave birth to their son when she was 17 years of age),

testified that Dustin admitted to her that he kicked Gonzalez "a couple of times, then . . . smashed his head in because the guy kept spitting on his foot."[9] Daffron testified Dustin told her on at least two dozen occasions that he smashed Gonzalez's head and had used "a tire jack and a tire rim" to accomplish the beating. Daffron further testified Dustin "told me when he threw me through a wall that he got away with two murders, he can get away with a third one."[10] Daffron recounted various instances of violent assaults and threats Dustin had inflicted on her, including when she was three months pregnant and residing with him in a hotel room paid for by the Fresno County District Attorney's Office. Daffron recounted two occasions on which she was present when Dustin met with Fresno County Prosecutor Polacek, then assigned to prosecute defendant in the present case, and received money from him. She testified that subsequent to the preliminary hearing, Polacek gave Dustin a bus ticket to the Sacramento area, but Dustin secured a refund for the value of the ticket. Another incident of abuse occurred when Daffron was seven months pregnant. "He threatened to tie me up in the closet and leave me for dead. He said nobody would ever find me in there." Dustin thereafter was admitted to a hospital psychiatric ward.

---

[9] At the time the charged offenses were committed in 1991, this witness was named Kristi Smith. For the sake of clarity, we refer to her by the married name she used four years later at trial, Kristi Daffron.

[10] Daffron elaborated: "[Kenny Dustin] said it didn't matter what he said in court because he wasn't a snitch and he wasn't a rat and he wasn't taking the fall for it because two niggers were going to go to prison for something he did. And he thought that was really funny. . . . [¶] . . . [¶] I asked him what happened. And he told me that some Mexican got killed. It didn't matter, it was a Mexican that wasn't no longer walking around, and there was two niggers that were going to prison for it." Daffron explained that Dustin also referred to African-American persons as "toads and cockroaches," and that every time he referred to defendant (and defendant's cousin, Jerry Franklin), "he referred to him as a nigger."

Daffron acknowledged that her relationship with Dustin had been a tumultuous one, punctuated with numerous arguments and separations, and that Dustin once had kidnapped their child at gunpoint. In response to Dustin's conduct, Daffron contacted the police "[p]robably at least 45 times" and obtained a restraining order. She denied that her testimony at trial was motivated by a desire to retaliate against him. She acknowledged, however, that at the time she gave her testimony at trial, she was angry at the Fresno County District Attorney's Office, "[b]ecause every time that Kenny beat me up, every time I made a police report, nothing was done about it. Nothing."

Daffron further testified that Dustin repeatedly informed her that because he was the "star witness" in the present case, the Fresno County District Attorney's Office was protecting him from going to jail for the beatings and other abuse he administered to Daffron, and for an incident in which he assertedly abducted their son at gunpoint. Daffron's father, Allen Smith, corroborated his daughter's testimony, recalling that Dustin told him "my butt is covered," referring to the protection from prosecution Dustin assertedly received from that office. Sanford Glickman, a private investigator retained by Jerry Franklin's counsel, testified regarding that office's assertedly favorable treatment of Dustin in connection with an alleged burglary.

Daffron's father, Allen Smith, testified that after Dustin "accepted the Lord, Jesus Christ, as his savior," Dustin admitted to Smith that he "had struck the victim several times himself . . . [on] or about the head. And he was bleeding all over and Kenny didn't know if he was dying or dead or what, when he was beating him." Smith recalled that Dustin had used "[a] real heavy hubcap or a tire rim or something . . . he always talked about a heavy hubcap because he couldn't find anything else or they couldn't find anything else or something like that." Smith also recalled Dustin informing him on four or five occasions that "I've already killed twice and I can take you out just as easy."

Polacek testified that he had interviewed Dustin, but considered him "strictly a witness" who had "committed no crime as far [as] I was concerned." Polacek acknowledged he had received 30 to 40 telephone calls from Dustin, including some lengthy calls two or three weeks prior to Polacek's trial testimony in which Dustin mentioned he had been arrested. Polacek denied that Dustin had asked for help in pending prosecutions and denied Dustin had received any deal in return for his testimony. Polacek added: "The only thing I ever told him . . . [was] . . . if the statements you've given previously are all the truth, you won't be charged." "In my view," Polacek testified, "from 1991 to the present, Mr. Dustin has no criminal culpability. And there is no point in giving somebody a deal when no deal is needed." He acknowledged that Daffron and her parents had met with him and accused Dustin of having had a "more active role" in the homicide than previous evidence had suggested. Polacek was uncertain but believed he had not discussed with Dustin the allegations against him. Polacek did not take steps to investigate the allegations, believing them to have been motivated by animus against Dustin.

At trial, the defense also presented evidence indicating that approximately three weeks prior to the preliminary hearing, Dustin had obtained financial assistance from the Fresno County District Attorney's Office following an incident in which Dustin was robbed, his stomach slashed with a knife, and his assailants allegedly declared, "let's see if you testify now." Fearful, Dustin thereafter sought protection from the Fresno County District Attorney's Office, which in response provided him with modest sums of money for groceries, lodging, and relocation expenses including a one-way bus ticket to Paradise, California.[11]

A defense investigator testified that the prosecution had not provided Daffron's name to the defense in the early phases of discovery; rather, the investigator discovered her identity when he searched court records disclosing restraining orders that had been entered against Dustin. The investigator

---

[11] Daffron testified that she saw Dustin use the expense money he had received from the Fresno County District Attorney's Office to purchase drugs.

added that the prosecution did not provide records of payments made to Dustin by the district attorney's office prior to his being served with a subpoena duces tecum.

The defense further presented evidence indicating that a few weeks prior to the commencement of trial, Dustin was in custody on a matter unrelated to defendant's case and so informed the Fresno County District Attorney's Office. The defense attempted to establish that the prosecution offered Dustin a deal in order to reduce his period of incarceration for crimes unrelated to those charged in the present case, in exchange for his testimony implicating defendant in the present case. The defense established that the prosecution struck such a bargain with the witness Michael Beckham.

Sergeant Snow testified for the defense that Dustin had stated during interrogation that he had gone along with defendant's plan to rob Gonzalez and that Dustin told Snow that "the game plan was to beat the victim and rob him." Dustin acknowledged that he knew the plan in advance and was working with defendant.

The defense presented the testimony of private investigator Sanford Glickman, who, in connection with the defense of Jerry Franklin, interviewed prosecution witness Michael Beckham. Glickman recalled that Beckham had used several derogatory racial epithets when referring to defendant.

Defendant did not testify.

### 3. *The Prosecution's Case in Rebuttal*

In rebuttal, the prosecution called several witnesses, primarily to demonstrate that Dustin had not been offered a deal in exchange for his testimony, and that the expenses Dustin received from the Fresno County District Attorney's Office were not significant or unusual. The prosecution presented evidence indicating that Daffron herself was an abuser of illegal substances. Several prosecutors recounted their prosecution of Dustin for various offenses during the period preceding defendant's trial and asserted they had handled the cases in the usual manner and had no contact with Polacek concerning these prosecutions. Polacek directed the deputy prosecutor to handle the prosecution of Dustin as he would any other case.

Over defense objection, the prosecution read into the record Rosanna Beckham's preliminary hearing testimony, in which she recalled that while sitting in the automobile at the orchard on the night of the murder, "[s]ome-body had said that he [Gonzalez] was dead and somebody else said, well, make sure," and that she did not believe either one of the voices was that of Kenny Dustin.

On cross-examination, defense counsel elicited testimony that Dustin had bragged about his involvement in a murder, had a history of suffering from paranoid schizophrenic depression, and had been hospitalized for "irrational behavior."

## B. PENALTY PHASE EVIDENCE

### 1. The Prosecution's Case

The prosecution presented evidence indicating that in 1987, when defendant's former girlfriend informed him she was returning a videocassette recorder (VCR) to a coworker from whom she had borrowed the device, defendant responded by punching her in the ribs.

The prosecution also presented evidence establishing that in 1989, defendant had approached a high school student, Jennifer Wimberly, on the sidewalk in front of a delicatessen, and committed a battery with serious bodily injury upon her. The attack caused Wimberly to suffer three chipped teeth in addition to a laceration under her left eye that required six sutures to close. Wimberly testified she had never seen her assailant prior to the incident.

Finally, the parties stipulated that defendant had been convicted of and served prison terms for assault with a deadly weapon in 1981 (§ 245, subd. (a)), auto theft in 1989 (Veh. Code, § 10851), and the above referenced battery with serious bodily injury upon Wimberly in 1989. (§ 243, subd. (d).)

### 2. The Defense Case

The defense presented the testimony of several Fresno County Sheriff's Department officers, who described defendant as having been a good prisoner who did not present discipline or security problems. One officer described defendant as "a fairly nice fellow," another described him as "very courteous" and "quick to respond when asked or told to do something," and a third described defendant as "[v]ery respectful. . . . He's different—there's some bad inmates and good inmates. He was a good one. He never gave me any problems at all."[12]

---

[12] The defense also presented the testimony of other correctional officers explaining the circumstances of two altercations involving defendant while he was incarcerated awaiting trial. In the first incident, which took place on June 22, 1992, defendant attempted to strike another inmate; each inmate was restrained by correctional officers before he could make contact with the other, and each subsequently was disciplined. Defendant later regained his status as a trustee and was not considered a danger to staff. In the second incident, which occurred on August 4, 1992, correctional officers during a period of jail overcrowding, in an effort to make room for incoming inmates, attempted to move defendant from the cell he occupied alone, to one already housing two other inmates and containing only two beds; defendant resisted the

The defense also presented the testimony of defendant's mother, stepfather, and several other family members, who described the severe emotional impact they would suffer if defendant were executed.

Finally, the defense presented the testimony of Ted Dunlap who, at the time of trial, was serving a nine-year state prison sentence for burglary. Dunlap was the victim of defendant's assault with a deadly weapon—one of the charges to which the parties had stipulated at the close of the prosecution's case in aggravation. Dunlap explained that he and defendant "started fighting and a gun went off and everybody ran in different ways." Shortly after the firearm discharged, Dunlap discovered that he had been shot, although he did not know who had shot him. On cross-examination, Dunlap acknowledged that on the date of the incident, October 26, 1980, defendant was angry at him for having taken an unduly large share of the proceeds from a prior robbery they had committed together. In response to a question how the execution of defendant would impact him, Dunlap replied, "I would feel sad and hurt."

### 3. *The Prosecution's Case in Rebuttal*

The prosecution in rebuttal presented the testimony of two Fresno County Sheriff's Department deputies, each of whom described an incident in which defendant's cellmate during the time of trial refused to return his dinner trays, prompting officers to shut off the water to that cell, an act that angered defendant. The two cellmates ultimately were removed from the cell, separated, and placed in other cells. One officer described defendant as initially being "a little uncooperative with the move," but added that defendant ultimately "complied with the officers' instructions." The other officer testified that defendant declared, "as of Monday, anybody entering my cell, it's on." The latter officer interpreted defendant's statement as a threat to correctional staff.

The prosecution also read into the record the testimony of Ted Dunlap, given at the preliminary hearing in the proceedings that ultimately concluded with defendant's conviction for assault with a deadly weapon. During that hearing, Dunlap testified that defendant "had the gun. That's the only gun I seen. . . . Yes, I seen him with the gun."

### 4. *The Defense Case in Surrebuttal*

The defense read into the record additional testimony given by Ted Dunlap at the preliminary hearing noted immediately above. This testimony more

---

move, leading officers to handcuff and shackle him, and when the officers moved him into the other cell, defendant attempted to strike one of them.

fully described the shooting incident, including Dunlap's subsequent trip to a hospital while accompanied by defendant until he let Dunlap out at a location near the facility.

## II. DISCUSSION

### A. *GUILT PHASE ISSUES*

#### 1. *Whether the Trial Court Properly Admitted the Preliminary Hearing Testimony of Kenny Dustin*

Defendant contends the trial court erred in determining that prosecution witness Kenny Dustin was entitled to exercise his privilege against self-incrimination (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15), thereby rendering Dustin unavailable as a witness at the trial and leading to the introduction of Dustin's preliminary hearing testimony into evidence. Defendant contends the alleged error constituted a violation of his right to confront and cross-examine witnesses and to a fair trial, and also undermined the reliability of the jury's penalty determination. He claims violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and parallel provisions of the California Constitution.

Two statutory provisions are particularly significant to defendant's claim, Evidence Code sections 1291 and 240. Pursuant to Evidence Code section 1291, under various circumstances prior testimony by an unavailable witness is admissible despite the general rule excluding hearsay evidence.[13] Evidence Code section 240, subdivision (a) defines the circumstances under which a witness may be considered unavailable for the purpose of admitting the witness's prior testimony in evidence.[14] One such circumstance occurs when the witness properly invokes the privilege against self-incrimination at trial. (Evid. Code, § 240, subd. (a)(1).)

Defendant claims first that Dustin's preliminary hearing testimony was inadmissible pursuant to Evidence Code sections 240 and 1291, because

---

[13] Evidence Code section 1291, subdivision (a) provides in pertinent part: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

[14] Evidence Code section 240, subdivision (a) provides in pertinent part: "Except as otherwise provided in subdivision (b), 'unavailable as a witness' means that the declarant is any of the following: [¶] (1) Exempted or precluded on the ground of privilege from testifying concerning the matter to which his or her statement is relevant. [¶] . . . [¶] (5) Absent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."

Dustin was not entitled to exercise his privilege against self-incrimination. Specifically, defendant claims, Dustin waived the privilege against self-incrimination as to all the circumstances surrounding the charged crimes. Defendant rests this claim upon the circumstance that during the in limine hearing on the admissibility of Dustin's preliminary hearing testimony and the propriety of his invocation of the privilege, Dustin, without asserting the privilege, answered questions inquiring whether his preliminary hearing testimony was true.

Second, defendant contends that the prosecution should have afforded Dustin immunity from prosecution at trial, thereby permitting Dustin to testify and forcing him to submit to defendant's cross-examination in the presence of the jury. Defendant argues that the prosecution procured Dustin's unavailability at trial by withholding immunity, and that for this reason, Dustin was not unavailable within the terms of Evidence Code sections 240, subdivision (a), and 1291.[15] Defendant also contends the trial court on its own motion should have afforded Dustin immunity from prosecution.

a. *Factual background*

Dustin testified for the prosecution at the preliminary hearing without consulting an attorney concerning potential self-incrimination. The People were represented by Fresno County Deputy District Attorney Steven Polacek. At trial, represented by another deputy district attorney, the prosecution intended to call Dustin to testify during its case-in-chief. The trial court, however, appointed counsel to advise Dustin, because in its view Dustin could be viewed as a potential suspect in the murder of Miguel Gonzalez and in other crimes committed on February 17 to 18, 1991. After conferring with counsel, Dustin decided to assert his privilege against self-incrimination and to refuse to answer any questions relating to the crimes. The prosecution then announced its intention to offer into evidence the testimony given by Dustin at the preliminary hearing, under the former-testimony exception to the hearsay rule. (See Evid. Code, §§ 1200, 1291.)

The court conducted a hearing outside the presence of the jury in order to determine whether Dustin properly could invoke the privilege against self-incrimination, rendering him unavailable as a witness under the pertinent Evidence Code provisions. After Dustin was sworn, the prosecutor asked him several questions, including whether Dustin recalled the events of February 17 to 18, 1991, whether Dustin recalled seeing defendant at the Drakes'

---

[15] Evidence Code section 240, subdivision (b) provides: "A declarant is not unavailable as a witness if the exemption, preclusion, disqualification, death, inability, or absence of the declarant was brought about by the procurement or wrongdoing of the proponent of his or her statement for the purpose of preventing the declarant from attending or testifying."

residence during that period, whether Dustin recalled seeing the white Chevrolet Monte Carlo parked near the residence, whether Dustin recalled defendant beating Miguel Gonzalez with a tire jack, and whether Dustin recalled traveling to the area where the victim's body was dumped. Dustin refused to answer each question, expressly grounding his refusal on the privilege against self-incrimination. In response to the prosecutor's inquiry whether he had testified truthfully at the preliminary hearing, Dustin responded affirmatively.

On cross-examination, when defense counsel inquired of Dustin whether he intended to respond to any questions regarding the period February 17 to 18, 1991, Dustin replied, "No. I plead the Fifth." Defense counsel asked Dustin whether he intended to invoke his Fifth Amendment privilege "with respect to any questions that are asked of you about . . . those dates." Dustin responded, "Yes." In response to additional questions posed by defense counsel to Dustin regarding specific crimes committed against Miguel Gonzalez, Dustin repeatedly invoked the privilege. In response to defense counsel's question, Dustin again asserted that the testimony he gave at the preliminary hearing had been complete and truthful.

The defense objected to the admission of Dustin's preliminary hearing testimony, claiming that defendant's right to representation by counsel free of conflict of interest had been violated at the preliminary hearing. Specifically, defendant alleged that his own counsel at the preliminary hearing had a conflict of interest, because she was a member of the public defender's office and another deputy from the same office had represented Dustin on a prior occasion when Dustin had been charged with a battery in violation of section 242. Initially, defendant contended that because of the conflict, he did not have an appropriate opportunity to cross-examine Dustin at the preliminary hearing.

The defense also contended that, when Dustin testified at the in limine hearing at trial that he had testified truthfully at the preliminary hearing, he thereby waived his privilege against self-incrimination, and that as a consequence he was available as a witness and his prior testimony was inadmissible.

At a hearing held in response to the claim of conflict, the deputy public defender who had represented defendant at the preliminary hearing testified that she had been unaware at the time of the hearing that her office ever had represented Dustin and that her representation of defendant had been as vigorous as it would have been had her office never represented Dustin. Defendant's trial counsel conceded that any conflict of interest on the part of

defendant's preliminary hearing counsel had not caused defendant preju-dice.[16] Trial counsel acknowledged that prior counsel's cross-examination of Dustin at the preliminary hearing had been "excellent," "robust and uninhib-ited," and that "there was the same motive and incentive to cross-examine [Dustin] at [the] preliminary hearing as there is at . . . trial."

The trial court found that Dustin was unavailable as a witness within the meaning of Evidence Code section 240, subdivision (a)(1), and, pursuant to the former-testimony exception to the hearsay rule codified in Evidence Code section 1291, permitted the prosecution to introduce the testimony given by Dustin at the preliminary hearing. The trial court concluded that the conflict of interest claimed by defendant did not adversely affect the cross-examination of Dustin at the preliminary hearing.

The transcript of Dustin's preliminary hearing testimony was read to the jury. In his testimony, Dustin recounted his observation of the events of February 17 to 18, 1991. Dustin's testimony implicated defendant in the robbery, kidnapping, and fatal beating of Miguel Gonzalez.

b. *Dustin's asserted waiver of the privilege against self-incrimination*

■ Defendant claims the prosecution failed to carry its burden of demon-strating that Dustin was unavailable within the meaning of Evidence Code section 240, subdivision (a)(1). But if the trial court properly determined Dustin was entitled to assert his privilege against self-incrimination, the prosecution necessarily carried its burden, because a witness is unavailable if he or she is entitled to invoke the privilege. (Evid. Code, §§ 240, subd. (a)(1), 1291.) In substance, defendant's claim is that the trial court erred in concluding Dustin properly asserted rather than waived his privilege.

It is a fundamental principle of our law that witnesses may not be compelled to incriminate themselves, and the scope of a witness's privilege is liberally construed. (*Hoffman v. United States* (1951) 341 U.S. 479, 486 [95 L.Ed. 1118, 71 S.Ct. 814]; *People v. Seijas* (2005) 36 Cal.4th 291, 304 [30 Cal.Rptr.3d 493, 114 P.3d 742]; see Evid. Code, § 940.) "To invoke the

---

[16] Trial counsel commented: "Now I've inspected and read probably three times now Mr. Dustin's preliminary hearing testimony. I was the one that was going to cross-examine him at trial, so I was prepared to do that. And I cannot argue that there is prejudice [arising from the asserted conflict of interest] because Ms. O'Neill did an excellent job of cross-examination. And I'm, you know, admitting that and conceding that." Trial counsel then argued that Dustin's preliminary hearing testimony should be excluded as a sanction against the prosecution for its failure to inform the defense prior to the preliminary hearing that Dustin had a prior misdemeanor battery charge, information that would have alerted defense counsel to the potential conflict.

privilege, a witness need not be guilty of any offense; rather, the privilege is properly invoked whenever the witness's answers 'would furnish a link in the chain of evidence needed to prosecute' the witness for a criminal offense." (*People v. Cudjo* (1993) 6 Cal.4th 585, 617 [25 Cal.Rptr.2d 390, 863 P.2d 635], quoting *Hoffman v. United States, supra*, 341 U.S. at p. 486; see also *People v. Seijas, supra*, 36 Cal.4th at p. 304.)

■ "A witness may assert the privilege who has 'reasonable cause to apprehend danger from a direct answer.' " (*People v. Seijas, supra*, 36 Cal.4th at p. 304.) Moreover, " '[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.' [Citation.] To deny an assertion of the privilege, 'the judge must be " '*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate." ' " (*Id.* at pp. 304–305; see Evid. Code, § 404 [such evidence "is inadmissible unless it clearly appears to the court that the proffered evidence cannot possibly have a tendency to incriminate the person claiming the privilege"].) Given the broad protective scope of the privilege, waiver of a nonparty witness's privilege "is not to be lightly inferred." (*Klein v. Harris* (2d Cir. 1981) 667 F.2d 274, 287; see also *United States v. Seifert* (9th Cir. 1980) 648 F.2d 557, 561.)

Under the circumstances of the present case, we independently review the question whether the court properly permitted Dustin to invoke the privilege against self-incrimination. (*People v. Seijas, supra*, 36 Cal.4th at p. 304.)

Defendant does not dispute that Dustin had reasonable cause to apprehend danger from answering questions concerning his activities and observations on the night of the murder, or that he properly invoked his privilege as to the bulk of the questions posed to him at the in limine hearing. Indeed, defendant claims the police and the prosecution should have treated Dustin as a suspect from the outset of their investigation and prosecution.

Defendant claims, nonetheless, that, for the purpose of the trial, Dustin waived his privilege against self-incrimination as to the entire subject matter of his activities and observations during the period related to the murder. According to defendant, the waiver occurred during the in limine hearing when Dustin, after repeatedly invoking the privilege, failed to invoke it when he testified that his testimony at the preliminary hearing was truthful. Defendant reasons that Dustin's claim that he testified truthfully at the earlier hearing constituted a ratification of his preliminary hearing testimony, and that it essentially repeated his testimony at that hearing concerning his

activities during the period surrounding the crimes. Defendant claims Dustin waived or failed to assert the privilege as to the entire subject matter of his preliminary hearing testimony and that as a consequence, he was not unavailable within the meaning of Evidence Code sections 240, subdivision (a)(1) and 1291.

■ A nonparty witness may elect to waive his or her privilege against self-incrimination. In addition, in some instances a waiver may be implied when a witness has made a partial disclosure of incriminating facts. "It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details. [Citation.] The privilege is waived for the matters to which the witness testifies, and the scope of the 'waiver is determined by the scope of relevant cross-examination.' [Citation.]" (*Mitchell v. United States* (1999) 526 U.S. 314, 321 [143 L.Ed.2d 424, 119 S.Ct. 1307] (*Mitchell*); see *Rogers v. United States* (1951) 340 U.S. 367, 374 [95 L.Ed. 344, 71 S.Ct. 438] (*Rogers*) [a witness may not invoke the privilege as to details after voluntarily disclosing incriminating facts].)

On the other hand, a witness's failure to invoke the privilege against self-incrimination during one hearing within a proceeding does not necessarily constitute a waiver for the purpose of subsequent hearings. Thus the failure of a witness to claim the privilege at a preliminary hearing does not prevent the witness from refusing to testify regarding the same incriminating material at the trial. (*People v. Seijas, supra,* 36 Cal.4th at p. 303; *People v. Malone* (1988) 47 Cal.3d 1, 23 [252 Cal.Rptr. 525, 762 P.2d 1249], citing *Overend v. Superior Court* (1900) 131 Cal. 280, 284 [63 P. 372]; *People v. Maxwell* (1979) 94 Cal.App.3d 562, 570–571 [156 Cal.Rptr. 630].) Similarly, a witness's incriminating admission at an in limine hearing concerning the admissibility of evidence ordinarily does not prevent the witness from invoking the privilege against being compelled to give testimony regarding the matter at the trial. (*People v. Lawrence* (1959) 168 Cal.App.2d 510, 517 [336 P.2d 189]; see also 2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, § 500, p. 808; 31A Cal.Jur.3d (2002) Evidence, § 574, p. 122.)

■ Applying these principles, we observe that any waiver of the privilege that occurred by virtue of Dustin's statement that he had told the truth at the preliminary hearing ordinarily would be binding upon Dustin only within the context of the in limine hearing. Even if we assume without deciding that Dustin essentially ratified his preliminary hearing testimony when he asserted he had been truthful at that hearing, he did so only after he clearly and justifiably had asserted his privilege as to his conduct and observations during the period related to the crimes. And even if his asserted ratification could have opened him to further questioning during the in limine hearing despite

his assertion of the privilege, it does not follow that the asserted ratification constituted a waiver of his privilege for the purpose of trial. Dustin's statement did *not* occur at trial, nor did it occur when the trial court was acting in a factfinding capacity. As noted, waiver of the privilege is not lightly inferred (*Klein v. Harris, supra*, 667 F.2d at p. 287), and there can be little justification for compelling a witness to incriminate himself concerning a whole series of events as to which he has invoked the privilege, when there is no need to do so to ensure the integrity of the factfinding process.

Significantly, application of the waiver doctrine depends upon the purpose of the hearing at which the statements are made and the impact upon the integrity of the factfinding process if assertion of the privilege is permitted. "The justifications for the rule of waiver in the testimonial context are evident: A witness may not pick and choose what aspects of a particular subject to discuss without casting doubt on the trustworthiness of the statements and diminishing the integrity of the factual inquiry. As noted in *Rogers,* [*supra*, 340 U.S. 367] a contrary rule 'would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony,' [citation] . . . [and] 'make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell.' [Citation.]" (*Mitchell, supra*, 526 U.S. at p. 322; see also 1 McCormick on Evidence (6th ed. 2006) § 133, p. 562 [the waiver rule "rests primarily . . . on the need to avoid leaving triers of fact with the limited version of relevant information that would be before them if a witness was permitted to at will pick a point at which to invoke the privilege"].)

In the context of a claim that a statement made by a defendant at a proceeding in which a guilty plea was entered constituted a waiver of the privilege at the ensuing sentencing hearing, the United States Supreme Court in *Mitchell, supra*, 526 U.S. 314, examined the nature of the two proceedings and determined that the defendant's guilty plea and concession that she did "some of it," during discussion of the factual basis for her plea, did not constitute a waiver of the privilege against self-incrimination for the purpose of the sentencing hearing. (*Id.* at p. 322.)

The high court in *Mitchell* explained that had the petitioner testified at a *trial* that she did "some of it," she would have subjected herself to cross-examination at sentencing on related subject matter. (*Mitchell, supra*, 526 U.S. at p. 322.) On the other hand, "[t]he concerns which justify the cross-examination when the defendant testifies are absent at a plea colloquy"—a hearing the high court characterized as one protecting the defendant from an involuntary or unintelligent plea. (*Ibid.*) "There is no convincing reason why the narrow inquiry at the plea colloquy should entail such an extensive

waiver of the privilege. Unlike the defendant taking the stand, who 'cannot reasonably claim that the Fifth Amendment gives him . . . an immunity from cross-examination on the matters he has himself put in dispute,' [citation] the defendant who pleads guilty puts nothing in dispute regarding the essentials of the offense. Rather, the defendant takes those matters out of dispute, often by making a joint statement with the prosecution or confirming the prosecution's version of the facts. Under these circumstances, there is little danger that the court will be misled by selective disclosure. In this respect a guilty plea is more like an offer to stipulate than a decision to take the stand. Here, petitioner's statement that she had done 'some of' the proffered conduct did not pose a threat to the integrity of fact-finding proceedings, for the purpose of the District Court's inquiry was simply to ensure that petitioner understood the charges and that there was a factual basis for the Government's case." (*Id.* at pp. 322–323.)

As the high court suggested in the *Mitchell* decision, we consider the purpose of the hearing at which it is claimed Dustin waived his privilege against self-incrimination. The purpose of the in limine hearing in the present case was to permit the trial court to determine whether the witness was entitled to invoke the privilege during testimony at the trial, thereby rendering him unavailable as a witness for the purpose of Evidence Code sections 240 and 1291. Dustin's testimony, at the conclusion of his direct and cross-examination at the in limine hearing, that he told the truth at the preliminary hearing, did not cast doubt on the trustworthiness of his other statements at the in limine hearing. The concerns that would justify application of the waiver doctrine to permit cross-examination at a trial were absent at the in limine hearing, at which Dustin consistently invoked his privilege as to specific questions and merely concluded with a general assertion that he had told the truth at the prior hearing. In view of the broad protection afforded to potential witnesses by the privilege against self-incrimination, we cannot conclude that Dustin's general ratification caused this nonparty witness to lose the protection of the Fifth Amendment privilege he just had invoked repeatedly. Moreover, as in the *Mitchell* case, in which the defendant had made incriminating statements at a plea colloquy rather than at trial in the presence of the jury, when Dustin assertedly ratified his prior testimony at the in limine hearing, the trier of fact was not present and the testimony had no impact upon the factfinding process at trial. Accordingly, even if Dustin had made an incriminating admission at the in limine hearing, his asserted "waiver" of the privilege would be effective solely for the purpose of that hearing.

Contrary to defendant's assertion, neither *U.S. v. Rosario Fuentez* (10th Cir. 2000) 231 F.3d 700, 707, nor *United States v. Seifert, supra,* 648 F.2d 557, 561, assists him. Both cases are distinguishable, because they concern a witness's partial disclosure of incriminating matter during testimony *at*

*trial*—a forum in which a party cannot be permitted to distort the factfinding process by allowing witnesses to give some testimony on a topic but to assert the privilege against self-incrimination to bar related questioning. We are not presented with a case in which a witness testifies to the *jury* that his prior testimony was truthful, and then invokes the privilege concerning the subject matter of the former testimony, which is then read to the jury. Such testimony would implicate confrontation rights that simply are not at stake when a witness testifies before the court at an in limine hearing.

■ We conclude that the trial court properly determined it was not "perfectly clear" that Dustin's answers could not possibly have a tendency to incriminate him (*People v. Seijas, supra*, 36 Cal.4th at p. 304), and that the witness's asserted ratification of his preliminary hearing testimony at the in limine hearing did not constitute a waiver of his right to invoke the privilege for the purpose of testifying at trial. The trial court did not err in finding Dustin was entitled to invoke his privilege against self-incrimination, and as a consequence the court correctly determined that Dustin was unavailable as a witness within the terms of Evidence Code sections 240, subdivision (a)(1) and 1291.[17]

Defendant nonetheless complains that his constitutionally guaranteed right to confront the witnesses against him was violated because Dustin was permitted to invoke his privilege against self-incrimination, thereby avoiding cross-examination at trial. (See U.S. Const., 6th & 14th Amends.; *Pointer v. Texas* (1965) 380 U.S. 400, 403–405 [13 L.Ed.2d 923, 85 S.Ct. 1065].)

■ Although defendants have the general right to confront the witnesses against them, this right is not absolute and properly gives way when a witness is entitled to the protection of the Fifth Amendment privilege against self-incrimination and the defendant had an appropriate prior opportunity to cross-examine the witness. (*People v. Seijas, supra*, 36 Cal.4th at p. 303, citing *Crawford v. Washington* (2004) 541 U.S. 36, 59 [158 L.Ed.2d 177, 124 S.Ct. 1354].) "The defendant 'must not only have had the opportunity to

---

[17] Defendant contends Dustin's asserted ratification of his preliminary hearing testimony meant that "[j]ust as a testifying defendant's bare denial of complicity . . . opens up the whole subject matter of the charged crime," the ratification meant that defendant was "entitled to cross-examine [the] witness about any and all matters about which the witness claims to have testified truthfully." In his briefs, he discusses the scope of permissible cross-examination after a defendant or witness makes a general denial, relying upon this court's decision in *People v. Earp* (1999) 20 Cal.4th 826, 883–884 [85 Cal.Rptr.2d 857, 978 P.2d 15], in which we concluded that a witness's general denial of complicity in a crime can broaden the scope of permissible redirect examination. Because defense counsel apparently had no complaint about the scope of cross-examination allowed *at the in limine hearing* and because the jury was not present when Dustin ratified his prior testimony, the question of the *scope* of proper cross-examination is not before us.

cross-examine the witness at the previous hearing, he must also have had "an interest and motive similar to that which he has at the [subsequent] hearing." ' [Citation.] . . . The recent [*Crawford*] decision . . . although changing the law of confrontation in some respects, left these principles intact." (*People v. Seijas, supra,* 36 Cal.4th at p. 303, italics omitted.) Significantly, "[a] witness who successfully asserts the privilege against self-incrimination is unavailable to testify for these purposes." (*Ibid.*)

■ Within the context of the in limine hearing, defendant was permitted to cross-examine Dustin, and defense counsel elicited the same ratification that Dustin provided on direct examination. Defendant cannot establish a violation of his confrontation rights at *trial* simply because a witness at an in limine hearing, after repeatedly invoking his privilege as to questions that clearly called for incriminating answers, answered a general question calling for his ratification of his preliminary hearing testimony. This answer had no impact on defendant's countervailing constitutional right to confront witnesses.

Defendant claims a confrontation clause violation on the ground that he did not have an adequate opportunity to cross-examine Dustin at the preliminary hearing. But defendant's trial counsel conceded that the opportunity for cross-examination had been exploited fully at the preliminary hearing, and that defense counsel's examination at that hearing had been "excellent."

Defendant counters that he lacked an adequate opportunity to cross-examine Dustin at the preliminary hearing, because the prosecutor failed to disclose to the defense, prior to the preliminary hearing, contacts the prosecution had had with the witness, particularly the prosecution's agreement to pay approximately $200 toward Dustin's living expenses and the prosecution's asserted secret or implicit promise to Dustin that he would not be prosecuted.[18] In defendant's view, defendant consequently did not have an interest and motive for cross-examination at the preliminary hearing similar to his interest and motive for cross-examination at trial.

At trial, the defense did not object to the admission of Dustin's preliminary hearing testimony on this ground and did not bring to the court's attention the

---

[18] The record supports the claim that the prosecutor did not disclose the fact of payments to Dustin prior to the preliminary hearing. Subsequent to the preliminary hearing, the prosecutor resisted a defense motion to compel discovery of the payments, claiming payments to Dustin were not discoverable because, if made, they had been made in connection with a witness protection program. Defendant's claim that the prosecution offered secret or implicit immunity to Dustin prior to the preliminary hearing is based upon nothing more than speculation (see fns. 19, 20, *post*); when the defense questioned Dustin on this subject at the preliminary hearing, the prosecutor (Polacek) and Dustin denied there was any immunity agreement. At trial, too, Polacek denied having promised Dustin immunity.

circumstance that the prosecution had paid Dustin's living expenses while assertedly failing to disclose this or other information to the defense prior to the preliminary hearing. Rather, although by this time the defense had been made aware of the payments, defense counsel ultimately conceded that the cross-examination had been thorough and vigorous. Nor did the defense argue that Dustin's testimony should be excluded because there had been a secret or implied immunity agreement prior to the preliminary hearing.

Under the circumstances, defendant failed to preserve the claim that Dustin's testimony should have been excluded at trial because the prosecution's asserted withholding of evidence prior to the preliminary hearing substantially impaired his ability to cross-examine Dustin at that hearing. We reach this conclusion because " 'questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal. [Citation.]' " (*People v. Seijas, supra,* 36 Cal.4th at p. 301; see *People v. Partida* (2005) 37 Cal.4th 428, 434–435 [35 Cal.Rptr.3d 644, 122 P.3d 765].) In light of defendant's failure to object on this ground at trial, the trial court did not hold a hearing on defendant's factual assertion that the People improperly delayed discovery or failed to disclose potentially inculpatory evidence prior to the preliminary hearing, nor did the court consider any argument concerning the specific impact any omission may have had on the prior hearing. "The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal." ' [Citation.]" (*People v. Partida, supra,* 37 Cal.4th at p. 434; see also *id.* at p. 435 [recognizing a narrow exception inapplicable to the present case].)

### c. *Immunity*

As noted, defendant contends Dustin was not unavailable within the terms of Evidence Code section 240, subdivision (a). His theory, in essence, is that, instead of employing reasonable diligence to secure the witness's presence at trial as assertedly required by Evidence Code section 240, subdivision (a)(5) and due process principles, the prosecution actually procured the witness's absence by failing to offer him formal immunity or to extend the de facto immunity assertedly received by Dustin at the preliminary hearing.

Defendant raises a number of interrelated claims, but they can be reduced to the claim that when Dustin asserted his privilege against self-incrimination at trial, the prosecutor or the court should have offered him immunity from prosecution in order to afford defendant the opportunity to cross-examine him

fully in the presence of the jury. Defendant's claim is based upon various inferences he draws from the record that suggest to him that at the preliminary hearing, the prosecutor had either a secret arrangement or an implicit understanding with Dustin that Dustin would not be prosecuted in connection with the crimes for which defendant stood trial.[19] Defendant claims that the prosecutor secured Dustin's preliminary hearing testimony with the intent of later withdrawing his secret or implicit promise of immunity, forcing Dustin to assert the privilege against self-incrimination at trial and thereby avoiding cross-examination in the presence of the jury. Accusing the prosecutor of willfully procuring the unavailability of Dustin for trial, or at the least of failing to make reasonable efforts to secure his availability by offering immunity, defendant contends the prosecutor distorted the factfinding process in a manner that violated defendant's right to a fair trial.[20]

---

[19] The preliminary hearing transcript supports a contrary view. At that hearing, the following colloquy occurred:

"[Defense counsel]: Your honor, I have a further concern. I'd like to know at this time what agreement [there] is between the DA's office and this witness [Kenny Dustin regarding] immunity. I'd like to voir dire on the subject after I've heard [the prosecutor's] answer.

"[Prosecutor]: There is no agreement.

"[Defense counsel]: I'd like to voir dire on that issue. [¶] . . . [¶]

"The Court: Inasmuch as there is no agreement as to immunity—there certainly is nothing in writing. [The prosecutor] has not submitted any immunity papers to the court. I think that the witness must understand that also, and I don't think it would be appropriate as to voir dire; perhaps on cross-examination, if you wish to take it up."

In her cross-examination of Kenny Dustin later at the preliminary hearing, defense counsel initiated the following exchange:

"[Defense counsel]: I believe you testified earlier that no one has made you any promises in this case, is that right?

"[Dustin]: Yes.

"[Defense counsel]: Yesterday, when we took a break, did you talk to [the prosecutor]?

"[Dustin]: Yes.

"[Defense counsel]: And that was when we brought up the issue of maybe you having an attorney, is that correct?

"[Dustin]: Yes.

"[Defense counsel]: Did [the prosecutor] at that time indicate to you that no charge would be filed against you?

"[Dustin]: He said it's up to me if I wanted an attorney or not.

"[Defense counsel]: Did he tell you . . . whether any charges were going to be filed against you?

"[Dustin]: No.

"[Defense counsel]: Did he tell you they wouldn't be?

"[Dustin]: No.

"[Defense counsel]: "So that's the only thing he told you, that it was up to you whether or not you wanted an attorney or not, is that right?

"[Dustin]: Yes."

[20] In support of the inferences he wishes us to draw, defendant notes that at the preliminary hearing, Steven Polacek, the assigned deputy district attorney, denied defense counsel's suggestion that Dustin might incriminate himself through his testimony and argued that Dustin

█ The grant of immunity is an executive function, and prosecutors are not under a general obligation to provide immunity to witnesses in order to assist a defendant. (*People v. Samuels* (2005) 36 Cal.4th 96, 127 [30 Cal.Rptr.3d 105, 113 P.3d 1125]; *People v. Stewart* (2004) 33 Cal.4th 425, 468 [15 Cal.Rptr.3d 656, 93 P.3d 271]; *In re Williams* (1994) 7 Cal.4th 572, 609 [29 Cal.Rptr.2d 64, 870 P.2d 1072]; *People v. Cudjo, supra*, 6 Cal.4th at p. 619; *In re Weber* (1974) 11 Cal.3d 703, 720 [114 Cal.Rptr. 429, 523 P.2d 229].) Similarly, we have expressed reservations concerning claims that trial courts possess inherent authority to grant immunity (see *People v. Samuels, supra*, 36 Cal.4th at p. 127), and even assuming the court possesses such authority, it has been recognized only when the defense has made a showing

---

had no need to consult an attorney. (When defense counsel asked whether the prosecutor had granted Dustin immunity, the prosecutor responded, "I am not, but this has been discussed thoroughly with this witness.")

In addition, defendant cites testimony from the investigating officer who arrested Dustin ("I would have to say that he was involved in the situation . . . having knowledge and having gone with them and having provided certain information to them about [the] location . . . where they wanted to dispose of the body."); the circumstance that the officer arrested Dustin; trial testimony from a subsequent investigating officer that he never treated Dustin as a suspect and released him from custody without seizing any evidence from him; and Polacek's testimony at trial that Dustin "has no criminal culpability."

Defendant also points to trial evidence indicating that the prosecution gave Dustin money for living expenses and a bus ticket prior to the preliminary hearing, but did not give him money thereafter, arrangements the prosecutor testified were for the purpose of "keeping him safe until the preliminary hearing," and that there was continuing telephone contact between Dustin and the prosecutor prior to trial.

Defendant further cites trial testimony indicating that the prosecutor informed a defense investigator that when Dustin faced unrelated burglary charges, the prosecutor had "made some communication with law enforcement and I believe his words were he took care of it and as a result Mr. Dustin was not arrested for the burglary." Defendant refers to Daffron's testimony that Dustin told her the district attorney would not prosecute him for any crimes he committed against her because Dustin was the prosecution's star witness in the present case. Defendant claims the payments from the prosecution to Dustin were kept secret from the defense until a defense investigator stumbled upon them.

Defendant also refers to testimony by Daffron and her father that Dustin informed Daffron he had delivered the fatal blows but that the prosecutor did not investigate further.

Defendant further points out that although Polacek objected to the appointment of an attorney for Dustin at the preliminary hearing, the prosecutor at trial did not object, nor did the prosecutor inform the court that her office did not consider Dustin to be a suspect or to have potential criminal liability. Defendant concludes: "From the foregoing, it is painfully obvious that not only did the prosecution extend de facto immunity protection to Kenny Dustin for his testimony at the preliminary hearing, the prosecution did its utmost to conceal the arrangements that it made and violated its most basic ethical obligation to the trial court by not informing the court both the arrangement and the prosecutorial position that Kenny Dustin would never be prosecuted for his role in the robbery-homicide of [the victim]."

that a *defense* witness should be afforded immunity in order to provide clearly exculpatory testimony. (See *People v. Stewart, supra*, 33 Cal.4th at pp. 469–470.)[21]

█ Contrary to defendant's contention, neither *Ohio v. Roberts* (1980) 448 U.S. 56, 74 [65 L.Ed.2d 597, 100 S.Ct. 2531], disapproved in part by *Crawford v. Washington, supra*, 541 U.S. 36, 62–63, nor *Barber v. Page* (1968) 390 U.S. 719, 724–725 [20 L.Ed.2d 255, 88 S.Ct. 1318], assists his claim that the prosecution was under an obligation to make reasonable efforts to persuade Dustin to testify at trial. He cites *Ohio v. Roberts, supra*, 448 U.S. 56, for the following proposition: "The basic litmus of Sixth Amendment unavailability is established: '[A] witness is not "unavailable" for purposes of . . . the exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial.' " (*Id.* at p. 74; see also *Barber v. Page, supra*, 390 U.S. at pp. 724–725.) This language does not imply, however, that a witness who appropriately invokes the privilege against self-incrimination is not "unavailable" without a showing that the prosecution made a "good-faith effort" to persuade him or her to testify, either through discussion or through the offer of a grant of immunity. Nor is defendant's claim assisted by his reliance upon very general pronouncements that "the constitution . . . strongly favor[s] live testimony" (*United States v. Kehm* (7th Cir. 1986) 799 F.2d 354, 360–361), or upon cases discussing the prosecution's failure to employ reasonable diligence to secure a witness's *attendance* at the trial. (See, e.g., *People v. Cromer* (2001) 24 Cal.4th 889, 904–905 [103 Cal.Rptr.2d 23, 15 P.3d 243]; *Whelchel v. Washington* (9th Cir. 2000) 232 F.3d 1197, 1209.)[22] As noted, it is settled that the preference for live testimony gives way when the witness properly invokes the privilege against self-incrimination and a prior appropriate opportunity for cross-examination existed.

---

[21] As for defendant's reliance upon judicial estoppel, we have recognized a limited application of the doctrine to criminal trials that is of little apparent relevance to the present case. (See *In re Sakarias* (2005) 35 Cal.4th 140, 155–156 [25 Cal.Rptr.3d 265, 106 P.3d 931] ["fundamental fairness does not permit the People, without a good faith justification, to attribute to two defendants, in separate trials, a criminal act only one defendant could have committed"]; see also *Russell v. Rolfs* (9th Cir. 1990) 893 F.2d 1033, 1037–1039 [the People were estopped from advocating that a federal habeas corpus remedy be procedurally barred because of the existence of a state remedy and then, when defendant sought the benefit of the state remedy, arguing that defendant was procedurally barred from pursuing the state remedy].)

[22] Indeed, defendant's claim that the prosecution must exercise diligence not only to secure the witness's presence, but also to convince a witness who wishes to assert a privilege to testify, has been rejected in one of the very cases he cites in support of his claim. (*U.S. v. Reed* (7th Cir. 2000) 227 F.3d 763, 767 [in the context of a witness's exercise of a testimonial privilege, "the rule is not that the government must do everything it can to get a witness to testify, only that it make a reasonable, good faith effort to get the witness into court"].)

Defendant also refers to federal authority that characterizes as a due process violation a prosecutor's refusal to grant immunity to a defense witness when the refusal was undertaken "with the deliberate intention of distorting the fact-finding process." (*Williams v. Woodford* (9th Cir. 2004) 384 F.3d 567, 600; see also *In re Williams, supra,* 7 Cal.4th at pp. 602–609.) We note that these authorities discuss prosecutorial interference with *defense* witnesses, whereas Dustin was a prosecution witness.

We need not resolve defendant's claims on the merits, however, because he failed to raise any of them in the trial court when Dustin's preliminary hearing testimony was offered into evidence. Yet each of the permutations of defendant's argument depends upon factual assertions concerning the prosecutor's credibility and intent. These claims are forfeited on appeal. (*People v. Lucas* (1995) 12 Cal.4th 415, 459–460 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *People v. Cudjo, supra,* 6 Cal.4th at p. 619; *People v. Sutter* (1982) 134 Cal.App.3d 806, 813 [184 Cal.Rptr. 829].)

This case constitutes a classic illustration of the basis for rules requiring that objections to the introduction of evidence and claims respecting the extension of prosecutorial or judicial immunity must be made in the first instance in the trial court. These objections and claims must be initiated in the trial court so that the court can take steps to prevent error from infecting the remainder of the trial, so that an adequate record may be developed, and so that the court, acting as a finder of fact that has observed the participants, may reach conclusions on matters such as credibility and intent. Equally important as a basis for forfeiture rules is the need to afford the prosecution the opportunity to rebut the defendant's claims of misconduct, provide additional foundation for the admission of evidence, or cure the error. As we explained in applying the forfeiture rule to a claim that a prosecution witness testified under a coercive grant of immunity: "In requiring an objection at trial, the forfeiture rule ensures that the opposing party is given an opportunity to address the objection, and it prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error." (*People v. Kennedy* (2005) 36 Cal.4th 595, 612 [31 Cal.Rptr.3d 160, 115 P.3d 472].)

Defendant contends his claim should not be forfeited, because it represents a pure question of law based upon undisputed facts. He relies upon a doctrine discussed in civil cases (see, e.g., *Hale v. Morgan* (1978) 22 Cal.3d 388, 394 [149 Cal.Rptr. 375, 584 P.2d 512] ["We have held that a litigant may raise for the first time on appeal a pure question of law which is presented by undisputed facts."]; *Panopulos v. Maderis* (1956) 47 Cal.2d 337, 341 [303 P.2d 738]; see also *Yeap v. Leake* (1997) 60 Cal.App.4th 591, 599, fn. 6 [70 Cal.Rptr.2d 680]) but, as noted, we have concluded specifically that a

defendant forfeits a claim that the court or the prosecutor should have granted immunity to a witness when the defendant has failed to raise that claim in the trial court. (*People v. Lucas, supra*, 12 Cal.4th at pp. 461–462; *People v. Cudjo, supra*, 6 Cal.4th at p. 619.) Furthermore, even assuming the general applicability of the doctrine cited by defendant, the predicate for his claim is absent. He does not ask us to resolve a pure question of law based upon undisputed facts. Instead he asks that we interpret and apply the law to the facts despite the circumstance that there is a critical factual dispute that the trial court never was asked to explore or resolve, namely whether the prosecution informally promised Dustin immunity from prosecution prior to the preliminary hearing and whether it withdrew that immunity at trial, intending to profit by eliminating defendant's live cross-examination of the witness. (See, e.g., *Panopulos v. Maderis, supra*, 47 Cal.2d at p. 341 ["if the new theory contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial the opposing party should not be required to defend against it on appeal"].)

Defendant also claims that his failure to request immunity for Dustin at trial should not bar consideration of his claim because, apart from the immunity issue, the prosecution failed to establish that it had employed reasonable diligence to procure Dustin's presence at trial within the meaning of Evidence Code section 240, subdivision (a)(5).

This claim also was not raised in the trial court and is forfeited. (See *People v. Smith* (2007) 40 Cal.4th 483, 517 [54 Cal.Rptr.3d 245, 150 P.3d 1224] ["A defendant may not challenge, for the first time on appeal, the procedure used by the trial court to find a witness unavailable."].)

■ In any event, Evidence Code section 1291 provides that former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness, subject to certain qualifications such as the party's right and opportunity to cross-examine the witness at the prior hearing. Evidence Code section 240, subdivision (a) defines unavailable witnesses as any of five types of witnesses. A witness who is exempted from testifying on the ground of privilege is defined as one type. (Evid. Code, § 240, subd. (a)(1).) This provision does not contain a "reasonable diligence" requirement, so defendant's claim must fail.

2. *Whether the Trial Court Erred in Admitting the Preliminary Hearing Testimony of Kenny Dustin in Light of the Circumstance That Some of the Witness's Cross-examination Was Performed by Counsel Representing Defendant's Codefendant*

Initially, defendant's case was joined with the prosecution of Jerry Franklin, and the preliminary hearing was conducted jointly. When Dustin testified at the preliminary hearing, he was subject to cross-examination by Franklin's counsel as well as by defendant's counsel. As we have discussed, in light of the court's finding that Kenny Dustin was unavailable as a witness at trial, the trial court permitted the prosecution to introduce Dustin's testimony at the preliminary hearing, including the portion that was responsive to his codefendant's cross-examination.

On appeal, defendant contends that the portions of Dustin's testimony elicited by Franklin's counsel should not have been admitted, because Franklin's motive and interest in cross-examining Dustin at the preliminary hearing were not the same as that of defendant. In light of this asserted dissimilarity, defendant argues that the introduction of this testimony violated his rights to due process of law, a fair trial, to confront witnesses, and to a reliable penalty determination. As we shall explain, defendant's position is without merit.

At the outset, because at trial defendant did not raise the claim that the portions of Dustin's preliminary hearing testimony elicited by defendant's codefendant should have been excluded from evidence, the claim is forfeited on appeal. (See Evid. Code, § 353; *People v. Seijas, supra,* 36 Cal.4th at p. 301; see also *People v. Smith, supra,* 40 Cal.4th at p. 517.)

Even if defendant had preserved his claim, it lacks merit. What was significant for the purpose of meeting the requirements of Evidence Code section 1291 and preserving defendant's right of confrontation was *defendant's* opportunity for cross-examination. Defendant's opportunity for cross-examination at the prior hearing was adequate, without regard to his codefendant's opportunity and motive for examining Dustin. To the extent Franklin's attorney may have questioned Dustin for the purpose of casting suspicion upon defendant, such examination was no more improper than similar examination by the prosecutor. Franklin's attorney was not representing defendant.

■ Evidence Code section 1291, subdivision (a)(2) focuses on whether the party *against whom the former testimony is offered* "had the right and opportunity to cross-examine . . . with an interest and motive similar" to that

at trial. Similarly, what is significant for the purpose of analyzing whether prior testimony is admissible under the Sixth Amendment to the United States Constitution is whether the party *against whom the prior testimony is offered* had an appropriate opportunity for cross-examination at the prior hearing. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1172–1174 [32 Cal.Rptr.3d 759, 117 P.3d 476].) Defendant was the party against whom Dustin's former testimony was offered, and as far as the present record discloses, he had the right and opportunity to cross-examine Dustin with an interest and motive similar to the interest and motive he had at trial. Defendant was able to cross-examine Dustin on *any* relevant question—regardless of whether such cross-examination related to testimony elicited by questions posed by the prosecution or by Franklin's attorney on cross-examination. Evidence Code section 1291 and the command of the confrontation clause were satisfied. (See *People v. Zapien* (1993) 4 Cal.4th 929, 975 [17 Cal.Rptr.2d 122, 846 P.2d 704]; see also *People v. Carter, supra,* 36 Cal.4th at pp. 1171–1174.)

Defendant cites three federal decisions in support of his position that testimony elicited by cross-examination performed by a codefendant's counsel at a former hearing does not suffice to render the testimony admissible under the former-testimony exception to the hearsay rule when the evidence is offered against a defendant who ultimately is tried separately. His reliance upon *U.S. v. Shaw* (4th Cir. 1995) 69 F.3d 1249, 1252, *U.S. v. Deeb* (11th Cir. 1994) 13 F.3d 1532, 1535, and *U.S. v. Clarke* (4th Cir. 1993) 2 F.3d 81, 83, is unavailing, because in each instance the ground for the court's decision was that the defendant—the party against whom the prior testimony was offered at trial—*had not been present or represented* at the prior hearing.

In contrast with the cited federal decisions, defendant was present at the prior hearing and was represented by counsel. He had the right and opportunity to cross-examine Dustin, with an interest and motive similar to that at trial. As noted, this was sufficient to fulfill the requirements of Evidence Code section 1291 and the confrontation clause. Indeed, as noted earlier, not only was his opportunity for confrontation adequate, but defense counsel conceded at the trial that the examination of Dustin had been excellent from the defense point of view. (See fn. 16, *ante.*)

> 3. *Whether the Trial Court Properly Refused to Inform the Jury That Kenny Dustin Had Exercised His Privilege Against Self-incrimination*

On the day the prosecution intended to call Kenny Dustin to testify at trial and prior to conducting the in limine hearing relating to Dustin's invocation of the privilege against self-incrimination, the court informed counsel that any assertion of the privilege should, in its view, take place outside the

presence of the jury.[23] On the following day, the court reiterated its preference that invocation of the privilege be "taken outside the presence of the jury."

Defense counsel responded: "Well, I realize that the court has to make a determination out of the presence of the jury as to whether the witness will take the Fifth. My client is strenuously opposed to not having him called in front of the jury to take the Fifth in front of the jury. My client wants to have him invoke the Fifth in front of the jury so that the jury will understand why he is not available as a witness. . . . [¶] . . . I would not ask question after question after question to invoke the Fifth, but just . . . ask him and have him say that he invokes the Fifth Amendment so the jury will understand why he is not here as a witness."[24]

The trial court rejected defense counsel's position: "I don't think it's the proper procedure to take any person who's claimed the Fifth of which the Court has found to be a valid claim and parade that in front of the jury. . . . [¶] My thought is that it's not just prejudicial to the defense but prejudicial to the People's case that [the jury is] speculating here is a person who's claimed the Fifth who could give testimony . . . but can't because of his claim so he must or she must know something. . . . You're sending the jury on a wild speculation as to what this person might have said had they not claimed that Fifth." In support of its ruling, the trial court cited *People v. Ford* (1988) 45 Cal.3d 431 [247 Cal.Rptr. 121, 754 P.2d 168], in which we observed: "Some courts have approved a procedure whereby the claim may be asserted in a pretestimonial hearing out of the presence of the jury. [Citations.] We commend that approach as a means by which to avoid the potentially prejudicial impact of the witness asserting the privilege before the jury." (*Id.* at p. 441, fn. 6.)

Prior to the introduction of Dustin's preliminary hearing testimony at trial, however, defense counsel revised her argument, informing the court: "I was not requesting that the court inform the jury that [Dustin] has invoked the Fifth Amendment. I can find no case authority supporting the jury be told that. But I think that it needs to be explained to the jury as to why somebody's transcript is being read. And I would request that the Court inform the jury

[23] On the date Dustin was scheduled to testify at defendant's trial, Dustin was in custody on drug charges unrelated to the crimes committed in the present case.

[24] Although defense counsel's argument immediately preceded the in limine hearing pertaining to *David Drake's* invocation of the Fifth Amendment privilege against self-incrimination, the court's observations and counsel's argument in response appear to pertain to *both* Drake and Kenny Dustin; on appeal, the parties treat the relevant passages in the record as embracing Dustin's invocation of the privilege and, although the record is not completely clear on this point, we believe the record can be so read.

that Kenneth Dustin is unavailable for testimony and therefore his preliminary hearing testimony will be read." The trial court agreed with the revised defense position, and so informed the jury.[25] The court similarly instructed the jury at the conclusion of the guilt phase.[26]

On appeal, defendant contends Dustin's invocation of the privilege against self-incrimination constituted relevant evidence of Dustin's belief in his own culpability and also was evidence of the existence of an arrangement between the prosecution and Dustin that expired subsequent to the preliminary hearing. According to defendant, this arrangement was relevant to the issue of Dustin's credibility. Defendant claims the trial court's refusal to grant defense counsel's initial request that Dustin invoke his privilege in the presence of the jury (or otherwise inform the jury regarding why Dustin was not testifying at trial) violated his constitutional rights to due process of law, confrontation, and a reliable penalty determination. As we shall explain, this argument lacks merit.

Because the defense withdrew its request that Dustin be forced to invoke the privilege in the presence of the jury, in favor of requesting the court to inform the jury that the testimony given by Dustin at the preliminary hearing would be introduced due to his unavailability to testify at trial, defendant has forfeited any such claim, regardless of its merit. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49 [17 Cal.Rptr.3d 710, 96 P.3d 30] [" '[i]f defense counsel intentionally caused the trial court to err,' " acting for tactical reasons and not out of mistake, the claim is barred on appeal as invited error]; *People v. Prieto* (2003) 30 Cal.4th 226, 264–265 [133 Cal.Rptr.2d 18, 66 P.3d 1123] [defense counsel's deliberate tactical choice to request an instruction bars consideration of error in the giving of the instruction on appeal]; see also *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 [36 Cal.Rptr.2d 235, 885 P.2d 1] ["Inasmuch as defendant both suggested and consented to the responses given by the court, the claim of error has been waived."].)

Even if we were to assume that the claim is not procedurally barred, we repeatedly have rejected the argument that a trial court commits error in denying a request that a witness who intends to invoke the privilege against self-incrimination be compelled to do so in the presence of the jury. (See Evid. Code, § 913, subd. (a) [the trier of fact should not draw inferences concerning

---

[25] The court stated: "Ladies and gentlemen, . . . Mr. Dustin is unavailable to testify . . . at this trial. So . . . the prosecution is going to be reading from the reporter's transcript of [Dustin's testimony given at] the preliminary hearing. You must consider that testimony as if it had been given before you in this trial."

[26] The court instructed the jury: "Testimony given by a witness at a prior proceeding who was unavailable at this trial has been read to you from the reporter's transcript of that proceeding. You must consider such testimony as if it had been given before you in this trial."

witness credibility or "as to any matter at issue in the proceeding" from a witness's invocation of privilege]; *People v. Holloway* (2004) 33 Cal.4th 96, 130–132 [14 Cal.Rptr.3d 212, 91 P.3d 164]; *People v. Mincey* (1992) 2 Cal.4th 408, 440–442 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *People v. Frierson* (1991) 53 Cal.3d 730, 743 [280 Cal.Rptr. 440, 808 P.2d 1197] ["Allowing a witness to be put on the stand to have the witness exercise the privilege before the jury would only invite the jury to make an improper inference."].) We decline to reconsider our previous holdings.[27]

Defendant argues that the defense was entitled to require Dustin to invoke his privilege in the presence of the jury as a form of evidence that would support the inference that Dustin received immunity at the preliminary hearing. But Evidence Code section 913 provides that the jury should not draw inferences "as to any matter at issue in the proceeding" from a witness's invocation of a privilege. The invocation of privilege no more supports the proposition that Dustin testified under a grant of immunity at the preliminary hearing than it establishes that Dustin was culpable in the crimes or lacked credibility as a witness.

4. *Whether the Trial Court Properly Refused Defendant's Request to Ask Leading Questions of Defendant's Original Prosecutor*

During his case-in-chief, defendant called to the witness stand Steven Polacek, who, as noted, was the prosecutor assigned to defendant's case prior to trial. Defendant's purpose was to elicit testimony concerning inducements or benefits that may have been promised to Kenny Dustin in exchange for Dustin's testimony against defendant.[28] Shortly after the examination commenced, defense counsel's inquiries prompted the trial prosecutor to interpose objections that defense counsel improperly was asking leading questions on

---

[27] As we have declared, "[a] defendant's rights to due process and to present a defense do not include a right to present to the jury a speculative, factually unfounded inference" on the issue of guilt based upon a witness's invocation of his or her privilege against self-incrimination. (*People v. Mincey, supra,* 2 Cal.4th at p. 442.) Defendant adds nothing to his claim by relying upon *Chambers v. Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038] and *Green v. Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150]. "As we have done in similar cases, '[w]e . . . reject defendant's various claims that the trial court's exclusion of the proffered evidence violated his federal constitutional rights to present a defense, to confront and cross-examine witnesses, and to receive a reliable determination on the charged capital offense. There was no error under state law, and we have long observed that, "[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense." ' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1243 [57 Cal.Rptr.3d 543, 156 P.3d 1015].)

[28] Polacek was elevated to a supervisory position prior to trial and for that reason was relieved of the responsibility of thereafter representing the People in this matter.

direct examination.[29] Defense counsel countered the objections with a request that the court designate Polacek—in light of his previous role as defendant's prosecutor—as a hostile witness and on that basis permit the asking of leading questions. (See Evid. Code, § 767, subd. (a).)[30] Outside the jury's presence, defense counsel argued: ". . . I can't think of a witness [who] would be more hostile than the former attorney representing the party that is prosecuting us or trying [to] kill us." The trial court sustained the prosecution's objections and denied defense counsel's request.

■■■ On appeal, defendant contends the trial court abused its discretion in refusing to designate Polacek as a hostile witness. At trial, defendant's request was based primarily upon Polacek's position as his former prosecutor. On appeal, defendant adds reference to heated exchanges between defense counsel and Polacek prior to the preliminary hearing, instances of asserted prosecutorial misconduct when Polacek failed to provide discovery in a manner deemed timely by defendant, and claims by defendant that Polacek refused to follow evidentiary leads associating Dustin with the murder. According to defendant, the trial court's ruling violated his right to due process of law, to a fair trial, to call and confront witnesses, and to a reliable penalty determination. We reject defendant's position. Evidence Code section 767 vests a trial court with broad discretion to decide when to permit the use of leading questions on direct examination. (*People v. Williams* (1997) 16 Cal.4th 635, 672 [66 Cal.Rptr.2d 573, 941 P.2d 752]; see also *In re Burton* (2006) 40 Cal.4th 205, 227 [52 Cal.Rptr.3d 86, 147 P.3d 1014]; *People v. Spain* (1984) 154 Cal.App.3d 845, 853–854 [201 Cal.Rptr. 555] [the issue is not one of constitutional dimension but instead concerns the trial court's discretion].) In any event, regardless of whether we restrict our consideration to defendant's claim at trial that Polacek's position as his prosecutor rendered him a hostile witness, or additionally consider instances of hostility between Polacek and the defense relied upon by defendant for the first time on appeal, defendant was not prejudiced by the court's requirement that he examine Polacek without employing leading questions.

---

[29] Defense counsel asked the witness: "Once the [case] assignment was made to you in February of 1991[,] would it be fair to say that the first thing you do is review all of the police reports that you have available to you at that point in time?" The trial prosecutor objected: "Your Honor, this is direct examination and counsel is leading the witness." Defense counsel shortly thereafter inquired: "You had a statement from Rosanne Beckham; correct? . . . And as to some of those statements[,] she basically said she was sitting in a car in the orchard. . . ." Again the trial prosecutor objected on the ground that counsel was leading the witness.

[30] Evidence Code section 767, subdivision (a) provides: "Except under special circumstances where the interests of justice otherwise require: [¶] (1) A leading question may not be asked of a witness on direct or redirect examination. [¶] (2) A leading question may be asked of a witness on cross-examination or recross-examination."

Defendant contends that because his counsel was required to ask open-ended questions on direct examination, Polacek improperly volunteered "irrelevant, inadmissible and prejudicial testimony" that was intended to "sabotage" defendant. But the sole example of a damaging reply from Polacek is as follows: When defense counsel inquired why Polacek gave Dustin money, the witness responded: "[T]his crime occurred February 18th of 1991. . . . On May 5, 1991, one of the reports that you have, there is a report of Kenny Dustin being attacked by some black individuals. His stomach was slashed and with a statement from one of those people saying let's see if you testify now, and he was robbed at the same time. He did call me following that and was scared. You know, I need some protection." Defendant claims the prosecutor improperly interjected the information that the attack was committed by African-American persons. Defendant does not explain why Polacek, a witness he claims was hostile to him, would not have taken the opportunity to interject the same reference to the assailants' race under examination as a hostile witness or under cross-examination by the prosecutor. Defendant does not contend, moreover, that he moved to strike any portion of Polacek's answers as irrelevant. Defendant essentially concedes his inability to establish prejudice. He acknowledges that "[w]hile there are other examples of open-ended questions leading to volunteered, nonresponsive testimony, the point is not that appellant was prejudiced by those specifics, but that his counsel was hamstrung from conducting proper examination of a hostile witness by being forced to use open-ended questions."

> 5. *Whether the Trial Court Properly Allowed Evidence of Bias to Be Admitted Against Kristi Daffron on the Issue of Her Credibility*

The defense presented the testimony of Kristi Daffron, Dustin's former girlfriend and the mother of their son. Daffron testified concerning several of Dustin's attributes, including his dishonesty, racism, and drug abuse, as well as his physical and emotional abuse of her. In calling Daffron, the defense not only sought to diminish Dustin's credibility in the eyes of the jury, but also sought to blame him for his participation in the crimes. Thus, Daffron testified that Dustin admitted to her on several occasions that he smashed Gonzalez's head and had used "a tire jack and a tire rim" to accomplish the beating. She testified that she repeatedly had complained to Steven Polacek, defendant's original prosecutor, regarding Dustin's incriminating statements and abusive treatment of her, but that Polacek did not respond.

On cross-examination, the prosecution sought to establish that Daffron harbored a bias against the prosecution based upon Polacek's alleged insensitivity toward her concerns and the circumstance that the Fresno County District Attorney's Office successfully had prosecuted Daffron's husband,

Ronald, leading to his incarceration for various crimes. Responding to defense objection, the prosecutor explained to the court that the evidence was relevant to explain Daffron's demeanor on the witness stand, noting it was "pretty clear how she feels about the People's representative in this case. And I think that has something to do with the fact that it was my very same office that sent her current husband to state prison." Defense counsel disagreed, claiming the question called for "inadmissible character evidence in an attempt to taint her with a brush of slime because she happens to be married to somebody who is in state prison and I would remind the Court that— which is abundantly clear that she made these complaints to Mr. Polacek [concerning Dustin's mistreatment of her] before she ever met her current husband." The trial court responded that the evidence reflecting that the local district attorney's office had prosecuted Daffron's husband might constitute inadmissible character evidence if Ronald Daffron had been the witness, but did not constitute such evidence when the issue was Kristi Daffron's credibility—specifically, her bias against the prosecution. The trial court permitted the prosecution to elicit evidence establishing that Daffron's husband then resided in state prison, having been convicted of three offenses when the Fresno County District Attorney's Office prosecuted him some two or three years after Daffron's contact with Polacek.

On appeal, defendant contends the trial court erred in permitting the prosecutor to impeach Kristi Daffron's credibility with her husband's felony convictions. He asserts that the prosecution sought the introduction of such "irrelevant" evidence "for no higher purpose than to smear Kristi's character in the eyes of the jurors"; that is, to impeach her testimony by suggesting it should not be credited because of her husband's status as a felon. First, he asserts Kristi's bias was no longer in dispute. Second, defendant claims the evidence was not relevant to bias, because of the interval of two and one-half years between Daffron's contact with the prosecutor and the purported source of the bias, namely, her current husband's incarceration. Finally, he denies the evidence had any tendency to demonstrate her bias against the prosecution. According to defendant, the trial court's ruling in this regard violated defendant's rights to due process of law, a fair trial, and a reliable penalty determination.

As we shall explain, defendant's position is without merit.

Subject to certain limitations inapplicable to the present discussion, all relevant evidence is admissible (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d)), and relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Evidence is relevant if it tends " 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive.

[Citations.]" (*People v. Garceau* (1993) 6 Cal.4th 140, 177 [24 Cal.Rptr.2d 664, 862 P.2d 664], disapproved on other grounds in *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) The trial court has considerable discretion in determining the relevance of evidence. (*People v. Garceau, supra,* 6 Cal.4th at p. 177; see *People v. Carter, supra,* 36 Cal.4th at pp. 1166–1167.) ▇ The "existence or nonexistence of a bias, interest, or other motive" on the part of a witness ordinarily is relevant to the truthfulness of the witness's testimony (Evid. Code, § 780, subd. (f)), and " '[t]he credibility of an adverse witness may be assailed by proof that he cherishes a feeling of hostility towards the party against whom he is called . . . .' " (3 Witkin, Cal. Evidence, *supra,* Presentation at Trial, § 277, p. 349.)

▇ Contrary to defendant's contention, the issue of Daffron's bias was far from conceded; rather, it was the focus of the prosecutor's cross-examination of the witness. Defendant claims the jury already had heard evidence that Daffron harbored a bias against the prosecution, but that circumstance did not render the evidence irrelevant. The circumstance that the Fresno County District Attorney's Office (whose representative was examining Daffron as a witness) prosecuted the witness's husband, leading to his incarceration in state prison *at the time of trial,* had an obvious "tendency in reason" to bias Kristi Daffron against that office and explain her hostile demeanor on the witness stand toward the prosecutor. Such a tendency is apparent even though the husband's prosecution occurred some years subsequent to Daffron's contact with Polacek, in view of the circumstance that the result of the husband's prosecution (his incarceration) persisted at the time of trial. Defendant's reference to Evidence Code section 1101 is unavailing. That provision establishes a general rule, subject to exceptions defined by statute, that evidence of character is inadmissible to prove the witness's conduct on a specific occasion. The challenged evidence did not constitute character evidence concerning the *witness,* however. Defendant's assertion that the circumstance Daffron's husband was in prison would have been understood as constituting shameful evidence of the *witness's* character is farfetched and speculative.

▇ Nor do we find that the trial court abused its discretion under Evidence Code section 352. Under that statute, the trial court retains broad discretion to assess whether the probative value of certain evidence "is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; see *People v. Rodrigues, supra,* 8 Cal.4th at p. 1124.) A trial court's discretionary ruling under this statute " 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage

of justice. [Citations.]' " (*People v. Rodrigues, supra,* 8 Cal.4th at pp. 1124–1125, italics omitted.) Under this standard, we perceive no flaw in the court's reasoning. Kristi Daffron's testimony regarding her husband was brief and presented no risk of confusing the issues or misleading the jury. As Daffron herself made clear during the prosecution's cross-examination of her: "[W]hat my husband did is what my husband did and it has nothing to do with this case. My husband knows nothing about this case."

As we have noted, the principal focus of the defense case was to discredit Kenny Dustin's testimony; toward this end, Kristi Daffron was merely one of several witnesses who portrayed Dustin in a decidedly negative light. Even if Daffron's testimony were understood by the jury in the sense claimed by defendant, there would be no prejudice. The jury was made aware of Daffron's deep disapproval of Polacek through other evidence, illustrating her bias against the prosecution and rendering negligible the impact of the challenged evidence. In addition, any error in permitting the question and answer could not have detracted meaningfully from the impeachment of Kenny Dustin's testimony that the defense elicited through the testimony of other witnesses.

### 6. *Instructional Issues*

#### a. *Whether the trial court was required to instruct the jury that Kenny Dustin was an accomplice as a matter of law*

The trial court instructed the jury that they were required to determine whether Kenny Dustin, Michael Beckham, and Rosanna Beckham were accomplices, as the court defined that term, and that an accomplice's testimony required corroboration and should be viewed with distrust.

At trial, when defense counsel raised the question whether the court would instruct the jury that Dustin was an accomplice as a matter of law, the court responded that it would not, because there was some contrary evidence—for example, evidence that Dustin denied he had been directly involved. According to the court, "It's really a question of fact, so I left it [at] that."

On appeal, defendant claims that the trial court's failure to instruct the jury that Dustin was an accomplice as a matter of law constituted a violation of defendant's right to due process of law, a fair trial, trial by jury, and a reliable penalty determination. We disagree.

 Section 1111 prohibits a defendant from being convicted on the uncorroborated testimony of an accomplice. Accomplice testimony must be corroborated by "other evidence as shall tend to connect the defendant with

the commission of the offense . . . . [¶] An accomplice is . . . defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) In other words, "[t]o be so chargeable, the witness must be a principal under section 31. That section defines principals as '[a]ll persons concerned in the commission of a crime, whether . . . they directly commit the act constituting the offense, or aid and abet in its commission . . . .' (§ 31.) An aider and abettor is one who acts with both knowledge of the perpetrator's criminal purpose and the intent of encouraging or facilitating commission of the offense. Like a conspirator, an aider and abettor is guilty not only of the offense he intended to encourage or facilitate, but also of any reasonably foreseeable offense committed by the perpetrator he aids and abets." (*People v. Avila* (2006) 38 Cal.4th 491, 564 [43 Cal.Rptr.3d 1, 133 P.3d 1076].)

Unless there can be no dispute concerning the evidence or the inferences to be drawn from the evidence, whether a witness is an accomplice is a question for the jury. On the other hand, the court should instruct the jury that a witness is an accomplice as a matter of law when the facts establishing the witness's status as an accomplice are " ' "clear and undisputed." ' " (*People v. Avila, supra,* 38 Cal.4th at p. 565; see also *People v. Hayes* (1999) 21 Cal.4th 1211, 1270–1271 [91 Cal.Rptr.2d 211, 989 P.2d 645]; *People v. Fauber* (1992) 2 Cal.4th 792, 834 [9 Cal.Rptr.2d 24, 831 P.2d 249].)

In addition, even if Dustin had been an accomplice as a matter of law, "[f]ailure to instruct pursuant to section 1111 is harmless if there is sufficient corroborating evidence. Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense." (*People v. Hayes, supra,* 21 Cal.4th at p. 1271.)

The record makes plain, and respondent concedes, that Dustin was present at the crime scene and was involved in a number of events that could have constituted aiding and abetting the robbery and murder of Miguel Gonzalez: Dustin acted as a lookout when Rosanna Beckham lured the victim into the alley where he was assaulted, and there was evidence Dustin knew the plan involved robbing the victim. Dustin was present during the robbery and helped open the vehicle trunk where Gonzalez was placed. In response to defendant's inquiry concerning where to take Gonzalez, Dustin suggested the walnut orchard in which Gonzalez ultimately was beaten to death, and there was evidence Dustin removed the victim from the trunk of the vehicle. Dustin's acts, however, do not establish he was an accomplice to robbery *as a matter of law*, because the record contains conflicting evidence on the issue of his intent.

As noted, an accomplice is one who aids or promotes the perpetrator's crime with knowledge of the perpetrator's unlawful purpose *and* an intent to assist in the commission of the target crime, and an accomplice may be guilty of the target crime and also of other crimes that are considered the natural and probable consequence of the target crime. (*People v. Avila, supra*, 38 Cal.4th at p. 564; *People v. Prettyman* (1996) 14 Cal.4th 248, 260 [58 Cal.Rptr.2d 827, 926 P.2d 1013]; *People v. Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].)

Dustin's status as an accomplice turned on whether he rendered aid with the intent to further the perpetrator's criminal purpose. Although there was evidence in support of the conclusion that Dustin had the requisite intent with respect to both the robbery and the murder, the evidence was not uncontradicted. Defendant focuses upon Dustin's liability as an aider and abettor of the robbery of the victim, reasoning that Dustin's liability for the victim's murder under a felony-murder theory would follow once his liability for the victim's robbery was established. But Dustin denied he had the intent to further defendant's criminal purpose, claiming he was present with defendant on Belmont Street, knowing of defendant's intent to rob but being present solely to oversee Rosanna's safety. In addition, there was evidence that Dustin, then 18 years of age, was present at the Drakes' home while defendant, then 29 years of age, was dominating those inside through a reign of terror, and that Dustin had been asked for assistance by Rosanna and Michael.

Defendant contends Dustin admitted he went with defendant and Rosanna to Belmont Street while she was used to lure prospective robbery victims, but contrary to defendant's claim, Dustin's statement that his purpose was "[t]o make sure [Rosanna] was okay" does not necessarily constitute an admission he intended to serve as a lookout or otherwise facilitate her participation in the commission of a robbery. Defendant claims other evidence established Dustin's status as an accomplice as a matter of law, referring to Dustin's "participation in the loading of the still-alive [victim] into the trunk, his acceptance of part of the loot, his suggestion of the orchard as a fine place to head off to, his participation in unloading [the victim] from the truck, and his facilitation of the departure from the orchard by prevailing upon and paying for a friend to give the car a jump start." Again, although there was evidence in support of the conclusion that Dustin, possessing a mental state that would render him an accomplice, aided in the commission of the crimes, we cannot say there is no reasonable dispute concerning the relevant facts.

Moreover, even if we were to assume the trial court erred in refraining from instructing the jury to view Dustin as an accomplice as a matter of law, such error was harmless because there was sufficient corroborating evidence.

"Corroborating evidence may be slight [and] may be entirely circumstantial" (*People v. Hayes, supra,* 21 Cal.4th at p. 1271), and although that evidence must implicate the defendant in the crime and relate to proof of an element of the crime, it need not be sufficient to establish all the elements of the crime. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1204 [120 Cal.Rptr.2d 477, 47 P.3d 262].) Testimony given by witnesses other than Dustin clearly was sufficient to corroborate key aspects of his testimony and to connect defendant to the crimes. Rosanna Beckham described how defendant used her to lure Gonzalez to the alley for the purpose of robbery, and, like Dustin, testified that defendant, Franklin, Dustin, and she transported the victim against his will to the orchard where he was fatally beaten. The responding law enforcement officers testified that when the police arrived subsequent to the murder and surrounded the residence where the victim's damaged, bloodstained vehicle was parked, defendant tried to depart from the residence through a back window. Upon defendant's arrest, the officers removed Gonzalez's California identification card from the pants defendant was wearing. Stephen O'Clair, the prosecution's criminologist, testified that defendant's gloves, pants, and shoes bore dried blood consistent with that of the victim. Although defendant did not testify at trial, the prosecution introduced the statement he gave to Fresno Police Department Detective Tom Sanchez, in which defendant implicated himself in the robbery and other offenses, and also introduced defendant's letter to Jerry Franklin, in which he also implicated himself in the crimes. In light of this overwhelming corroborating evidence, we discern no prejudice related to the trial court's decision not to instruct the jury to view Dustin as an accomplice as a matter of law and "[f]or the same reason, we reject defendant's further contention that the trial court's failure to instruct . . . violated his federal constitutional right to due process of law." (*People v. Frye* (1998) 18 Cal.4th 894, 966 [77 Cal.Rptr.2d 25, 959 P.2d 183].) The same may be said of defendant's claim that any error rendered the penalty determination unreliable in violation of the Eighth Amendment to the United States Constitution.

> b. *Whether the trial court prejudicially erred in instructing the jury to view defendant's confession and admissions with caution*

As noted above, the prosecution introduced two tape-recorded statements made by defendant to Fresno Police Department Detective Tom Sanchez shortly after defendant was arrested. Although defendant initially denied or attempted to minimize his involvement in the crimes that occurred on February 17 to 18, 1991, he eventually acknowledged participating in all of them except for the murder of Miguel Gonzalez and the alleged rapes of Rosanna Beckham. The tapes were played for the jury.

At the conclusion of the guilt phase, the trial court instructed the jury that "[e]vidence of an oral confession or an oral admission of the defendant should be viewed with caution."

Defendant contends the trial court erred in instructing the jury to view his oral confession and admissions with caution, because reasonable jurors would have interpreted the instruction as directing them to view defendant's version of the relevant events with skepticism, notwithstanding the circumstance that defendant's statements "included both inculpatory admissions, exculpatory statements, and admissions of culpability that mitigated the extent of [defendant's] involvement in the crime." He relies upon our determination that such an instruction should not be given when the defendant's statements were tape-recorded and the tape recording was played for the jury. (See *People v. Slaughter, supra,* 27 Cal.4th at p. 1200.) He claims a violation of his right to due process of law, a fair trial, and a reliable penalty determination.

█ "When evidence is admitted establishing that the defendant made oral admissions, the trial court ordinarily has a sua sponte duty to instruct the jury that such evidence must be viewed with caution. [Citation.] We have explained, however, that 'the purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made. [Citation.]' [Citation.] Accordingly, we also have held that this cautionary instruction should not be given if the oral admission was tape-recorded and the tape recording was played for the jury." (*People v. Slaughter, supra,* 27 Cal.4th at p. 1200.)

Although defendant is correct that the trial court should not have so instructed the jury for the reasons he has asserted, the error was harmless.

Defendant's contention that he was prejudiced because the jury would have understood the instruction as a basis for discounting the exculpatory elements of his statements is unavailing. As we have explained under similar circumstances: "To the extent that defendant's admissions were inculpatory, it is clear that defendant could not have been prejudiced by the giving of an instruction that the jury should view this evidence with caution. Defendant contends, however, that he suffered prejudice because there is a reasonable likelihood that the instruction caused the jury to view with suspicion the exculpatory portions of defendant's statements. The instruction, however, defined an admission as an out-of-court statement by defendant 'which tends to prove guilt.' 'In light of the definition of "admission," if the jury determines a statement does not tend to prove guilt when considered with the other evidence, it is not an admission. The cautionary language instructs the jury to view evidence of an *admission* with caution. By its terms, the language applies only to statements which tend to prove guilt and not to

statements which do not.' [Citation.] 'Juries understand that this instruction by its terms applies only to statements tending to prove guilt, not to exculpatory ones. To the extent a statement is exculpatory it is not an admission to be viewed with caution. [Citation.]' " (*People v. Slaughter, supra*, 27 Cal.4th at p. 1200.)

Defendant contends our holding in *People v. Slaughter, supra*, 27 Cal.4th 1187, is distinguishable because the defendant's statements in that case primarily were exculpatory. Defendant claims his own statements comprised a mosaic of inculpatory, exculpatory, and explanatory material. We reject his argument. Neither our reasoning nor our conclusion in the *Slaughter* decision turned on the proportion of the defendant's statements that was exculpatory. As in the *Slaughter* case, defendant's statements to Detective Sanchez included both inculpatory and exculpatory aspects and, as in our *Slaughter* decision, we are confident the jury understood the instruction did not apply to the exculpatory aspects of defendant's statements. Defendant could not have been prejudiced by the erroneous giving of the instruction to view his admissions with caution.

Nor are we persuaded that the trial court's instruction to the jury to view defendant's oral confession and admissions with caution constituted improper comment upon the evidence. Defendant relies upon *Quercia v. United States* (1933) 289 U.S. 466 [77 L.Ed. 1321, 53 S.Ct. 698], in which the high court found reversible error because the trial court gave its opinion of the defendant's testimony based upon the court's personal experience. The trial court stated that the defendant "wiped his hands during his testimony," advising the jury that it had been established as "fact" that such conduct "almost always [is] an indication of lying." (*Id.* at p. 468.) The high court concluded the trial court's remarks did not constitute a review of the evidence that would assist the jury in its task, but rather constituted a statement that broadly denounced the defendant's testimony as a lie. By contrast, the court in the present case did not offer its opinion concerning the evidence or rely on its personal experience to undermine the credibility of the defense case. The court merely instructed the jury with a pattern instruction, and did not embellish that instruction with the sort of improper, gratuitous remarks found objectionable in the *Quercia* decision.

As we also concluded in *People v. Slaughter, supra*, 27 Cal.4th 1187, "the trial court's error in instructing the [guilt phase] jury to view with caution defendant's tape-recorded admissions was harmless. It is not reasonably probable the guilt phase jury would have reached a result more favorable to defendant had the instruction not been given [citation], and there is no reasonable possibility that the . . . penalty phase jury would have rendered a different verdict in the absence of the error[.] [Citation.]" (*Id.* at p. 1201.)

Defendant advances no persuasive reason for this court to reach a different result in the present case, nor does his reference to his right to due process of law or a fair trial aid his position. Defendant contends also that his right to a reliable penalty determination was impaired because the instruction did not permit full consideration of mitigating evidence but, as explained, the instruction did not impede the jury's consideration of the exculpatory portions of the statements.

c. *Instruction pursuant to CALJIC No. 2.01*

Defendant contends the trial court erred by instructing the jury pursuant to CALJIC No. 2.01, which addresses the sufficiency of circumstantial evidence generally.[31] He asserts the instruction undermined the requirement that the prosecution establish defendant's guilt beyond a reasonable doubt by "not only allow[ing] but actually compel[ling], the jury to find [defendant] guilty on all counts and to find the special circumstances to be true using a standard lower than proof beyond a reasonable doubt," and by "shift[ing] the burden of proof to [defendant] by creating a mandatory rebuttable presumption that the prosecution's interpretation of the evidence was correct if that interpretation appeared reasonable and [defendant] did not produce another reasonable interpretation pointing toward his innocence." Defendant asserts that the instruction thus violated his constitutional rights to due process of law, trial by jury, and a reliable penalty determination.

In support of his position, defendant cites the italicized language noted in the margin (see *ante*, fn. 31), asserting that it allowed a finding of guilt (or the truth of a special circumstance allegation) based upon a degree of proof lesser than proof beyond a reasonable doubt, and that the instruction operated as an impermissible mandatory presumption. We repeatedly have rejected

---

[31] After instructing that facts may be proved by direct or circumstantial evidence, the trial court instructed the jury as follows: "However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.

"Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt.

"Also, if the circumstantial evidence as to any particular count is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation which points to defendant's innocence, and reject that interpretation which points to his guilt.

"*If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.*" (Italics added.)

substantially identical claims (see, e.g., *People v. DePriest* (2007) 42 Cal.4th 1, 52 [63 Cal.Rptr.3d 896, 163 P.3d 896], and cases cited), and because defendant has not presented any persuasive reason for us to reconsider those rulings, we decline to do so.

## B. *PENALTY PHASE ISSUES*

### 1. *Whether the Trial Court Improperly Limited Opinion Evidence Regarding Imposition of the Death Penalty*

Defendant's former girlfriend, Tina Lott, with whom he resided for a period of approximately one year, testified briefly on behalf of the prosecution regarding an incident that occurred in September 1987, approximately three years before she last saw defendant (and approximately five years prior to trial). She recalled that defendant became angry at her when she indicated she would return a borrowed VCR to a coworker. The dispute escalated, and according to her testimony she and defendant "had a confrontation inside the lobby [of Lott's employer's business] and he punched me to the side of the ribs. . . ."

Over the prosecution's objection that the defense was inviting error, defense counsel on recross-examination inquired of Lott why she was testifying, asking her whether "you would like to see [defendant] killed . . ." and "[w]hat type of man is Dexter Williams?" Defense counsel argued that the sought-after testimony constituted "character evidence at a penalty phase," citing section 190.3, factor (k).[32]

The trial court rejected defense counsel's position, describing as irrelevant Lott's opinion whether defendant should be executed. The trial court observed: "[Lott's] opinion is not relevant on that issue. Victim impact evidence is. The type of trauma she had. How she dealt with the trauma . . . . [¶] She is not a juror in this case and her opinion as to [whether defendant should be executed] is irrelevant. You can parade a hundred witnesses up here all saying whether or not they feel [defendant] should get the death penalty. I know of no case, and I have read a lot of them, that permits that question." The court further observed that counsel had not laid a foundation for establishing that Lott was a family member, and in the absence of such a foundation, eliciting her opinion would be improper.

On appeal, defendant contends that the trial court erred in limiting the testimony that could be elicited from Lott, and that the asserted error

---

[32] Section 190.3 provides in pertinent part: "In determining the penalty, the trier of fact shall take into account any of the following factors if relevant: [¶] . . . [¶] (k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

violated defendant's constitutional rights to due process of law, trial by jury, and to a reliable penalty determination. Specifically, defendant argues that the court's limitations on the questions that could be posed to Lott improperly limited his presentation of evidence in mitigation and also precluded defendant's friends and family from making pleas for mercy. In support, he relies upon *People v. Ervin* (2000) 22 Cal.4th 48 [91 Cal.Rptr.2d 623, 990 P.2d 506], in which we discussed a claim that testimony from a witness "with whom [the] defendant assertedly had a significant relationship, that [the] defendant deserves to live, is proper mitigating evidence as 'indirect evidence of the defendant's character.' " (*Id.* at p. 102; see also *People v. Mickle* (1991) 54 Cal.3d 140, 194 [284 Cal.Rptr. 511, 814 P.2d 290]; *People v. Heishman* (1988) 45 Cal.3d 147, 194 [246 Cal.Rptr. 673, 753 P.2d 629].) On the other hand, the view that a crime victim takes of the defendant's proper punishment "has no bearing on the defendant's character or record or any circumstance of the offense. [Citation.] Hence, the Eighth Amendment to the United States Constitution does not compel admission of those views." (*People v. Smith* (2003) 30 Cal.4th 581, 622 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

In the present case, Lott was both a victim of defendant's past criminal conduct within the meaning of *People v. Smith, supra,* 30 Cal.4th 581, and, according to defendant, someone with whom defendant had a significant relationship within the meaning of *People v. Ervin, supra,* 22 Cal.4th 48. Emphasizing the former close relationship between Lott and defendant, defendant contends the trial court erred in limiting the scope of the questions posed by defense counsel to Lott.

We need not determine whether Lott—a former girlfriend who had not seen defendant for several years prior to trial—in fact was someone whose relationship with defendant was sufficiently close to permit her to testify regarding the impact defendant's execution might have upon her, or whether, by contrast, Lott should be viewed as one of defendant's victims. Nor do we need to determine whether the trial court erred in directing counsel to lay a further foundation to establish the nature of Lott's relationship with defendant. Even if we were to assume error, defendant clearly suffered no prejudice. Upon inquiring of Lott outside the jury's presence whether the execution of defendant would have any impact upon her, and learning that it would *not,* defense counsel elected not to elicit further testimony from Lott. Had counsel asked such a question of Lott and received the same response during the testimony she gave in the presence of the jury, such testimony at best would have been of no help to defendant and more likely would have harmed his case.[33]

---

[33] Outside the jury's presence, defense counsel inquired of Lott whether "it would have an impact on you if [defendant were] put to death, and if so what would that impact be?" Lott responded that "[i]t would not have an impact on me." Defense counsel informed the court of

■ Defendant asserts that the trial court's ruling reached beyond Lott's testimony, categorically barring the defense from presenting any plea for mercy from defendant's family and friends. As noted, prior cases establish that the defense *may* elicit testimony from a defendant's family member or close friend stating the witness's opinion that the defendant deserves to live, because such opinion evidence reflects indirectly upon the defendant's character. (*People v. Smith, supra,* 30 Cal.4th at pp. 622–623.)

We do not read the record as reflecting a broad ruling concerning all potential mitigating testimony from defendant's family and friends. The court was asked to determine the relevance of *Lott's* opinion, and its statement that "[y]ou can parade a hundred witnesses up here all saying whether or not they feel [defendant] should get the death penalty" did not constitute consideration of, or a ruling upon, the relevance of testimony from defendant's relatives or close friends, whose desire that defendant not be executed would reflect upon his character. The court also invited defense counsel to present additional evidence of Lott's relationship with defendant. Moreover, contrary to defendant's contention that the court believed and instructed counsel that only relatives, but not persons standing in a significant relationship with defendant, could provide the contested type of opinion testimony, defendant's friend of 18 years was permitted to testify that he would feel "sad and hurt" if defendant were executed. Nor is there any suggestion in the record that, when defense counsel examined the defense character witnesses, counsel felt constrained by the court's remarks to avoid questions concerning the witnesses' opinion whether defendant should be given the death penalty.

Even assuming without deciding that the court's ruling limiting counsel's questions was error, it clearly was harmless beyond a reasonable doubt. (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1058 [47 Cal.Rptr.3d 467, 140 P.3d 775] [setting forth standard of review]; *People v. Stanley* (1995) 10 Cal.4th 764, 826 [42 Cal.Rptr.2d 543, 897 P.2d 481] [same].) The defense in fact called defendant's mother, stepfather, aunt, uncle, and two cousins, all of whom testified concerning the grief defendant's execution would cause them—and all without objection from the prosecution. As noted, a friend who was not a family member gave similar testimony. The jury clearly would have inferred from the testimony of these witnesses that they did not want defendant to be sentenced to death. (*People v. Stanley, supra,* 10 Cal.4th at p. 826.)

the exchange, and shortly thereafter advised that after "rethinking my position[,] I do not want to ask Miss Lott any more questions." The court excused the witness.

### 2. *Failure to Instruct That a Sentence of Life Imprisonment Without the Possibility of Parole Meant That Defendant Would Remain in Prison for the Remainder of His Life*

Prior to the voir dire examination of the prospective jurors, the defense moved in limine for an instruction that would inform the panel that if defendant were sentenced to life imprisonment without the possibility of parole, jurors should understand "that a sentence of life without the possibility of parole means exactly what it says."[34]

Prior to ruling on the written motion, the court inquired whether the defense would be satisfied with an instruction given during voir dire, or "is that something that you would like to instruct in the second phase [of trial] because it is somewhat irrelevant to the first phase [of trial]?" Defense counsel responded that an instruction to be given "in the voir dire script is fine. I know that the subject is going to come up in jury voir dire. It always does. . . . I just want some assurance from the court when that comes up in the jury voir dire, as I believe it will, that it won't just be [defense counsel] telling them that life without parole means life without parole, but that the judge can intervene at that point and let them know that they are to assume for purposes of this case that life without parole means what it says it means."

During the ensuing voir dire examination, the trial court instructed potential jurors that defendant was presumed innocent, that a penalty phase of the trial might never be reached, and that if a penalty phase were reached, the jury's choices of punishment would be limited to death or life imprisonment without the possibility of parole. In response to the defense request noted above, and using an instruction authored by defense counsel, the court instructed the potential jurors as follows: "In making your decision on this matter, you must assume that if you vote for death that sentence will be

---

[34] Defendant's motion in limine requested the instruction be given to "potential jurors" on voir dire. The People contend here that the motion was limited to "only" potential jurors and that defendant forfeited his claim that the instruction should have been given prior to the penalty phase of the trial. The motion was ambiguous on this point. Although it is true that defendant's "Notice of Motion and Motion to Pre-Instruct Jury on Parole Misconception" asked the court "to pre-instruct potential jurors on the penalty of Life Without Possibility of Parole," defendant's moving papers prayed "that *if the case proceeds to a penalty phase* this court *preinstruct the jury* that persons such as Charles Manson were sentenced under a different scheme and that the current scheme provides for a sentence of life without the possibility of parole. Should the jury reach the point where they have to determine the appropriate punishment, they must make this decision with the understanding that a sentence of life without the possibility of parole means exactly what it says." (Italics added.) In light of this ambiguity, we reject the People's characterization of defendant's request and reach the merits of defendant's claim.

carried out. Or if you vote for life without parole, the defendant will remain in prison for the rest of his life. To make a decision based upon an assumption that the penalty you select will not occur would be a direct violation of your duty as jurors."

Defendant now contends the trial court additionally should have instructed jurors at the *penalty phase* of the trial that they should assume a sentence of life imprisonment without the possibility of parole would mean defendant never would be released from prison. Defendant asserts he requested the instruction be given at the penalty phase, that the court's pretrial instruction to prospective jurors was inadequate, that the instruction would not have been remembered by the actual jurors nearly three months later, and that, in any event, the court had a sua sponte duty to provide the instruction. He further argues the court's failure to so instruct violated his constitutional rights to due process of law, trial by jury, and a reliable penalty determination. As we explain, defendant's claims are without merit.

In response to the trial court's inquiry whether defendant sought a pretrial instruction or a penalty phase instruction, defense counsel made clear that the request would be satisfied if *potential jurors* during *the voir dire examination* were informed that they are to "assume for purposes of this case that life without parole means what it says it means." But even assuming the defense request encompassed a request for penalty phase instructions (see fn. 34, *ante*), no error appears.

 "Although it is not improper to instruct the jury to *assume* that whatever penalty it selects will be carried out [citation], an instruction phrased in this qualified language may unnecessarily raise questions in the jurors' minds. Therefore, we have not required that trial courts so instruct the jury in every penalty phase. The trial court may give the instruction at the defendant's request and should give this or a comparable instruction if there is a reason to believe the jury may have some concerns or misunderstanding in this regard. [Citations.] [¶] This court has noted that brief references to commutation and similar possibilities during jury selection are generally insufficient to mandate clarifying instructions at the penalty phase. [Citations.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 378–379 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

In *People v. Smith, supra,* 30 Cal.4th 581, we rejected a claim that is substantially similar to defendant's. In that case, the defendant requested that the jury be instructed as follows: " 'Life without the possibility of parole

means exactly that and jurors are not to assume anything other than death means death by execution in the gas chamber; life without the possibility of parole means imprisonment for the rest of [the defendant's] natural life.' " (*Id.* at p. 635.) We concluded the court had not erred in refusing the instruction, reasoning that the pattern instruction adequately informs the jury and that, indeed, to instruct the jury that it must assume that a sentence of life without the possibility of parole means the defendant will be imprisoned for the rest of his or her life is inaccurate because it fails to acknowledge that the Governor retains the power of commutation. (*Ibid.*)[35]

Defendant's claim of error is rejected on the same reasoning. We note, too, that the record in the present case "does not demonstrate a plausible basis to infer jury concerns or misunderstanding about the consequences of its penalty verdict." (*People v. Kipp, supra,* 18 Cal.4th at p. 379.)

Defendant contends a court's obligation to give such an instruction cannot depend upon whether the jury has manifested confusion, citing *Kelly v. South Carolina* (2002) 534 U.S. 246 [151 L.Ed.2d 670, 122 S.Ct. 726]. In that case, the United States Supreme Court applied its holding in *Shafer v. South Carolina* (2001) 532 U.S. 36 [149 L.Ed.2d 178, 121 S.Ct. 1263]—that South Carolina juries may not be instructed simply that their sentencing choice lies between life imprisonment and death, but also must be informed that, under state law, a life sentence entails life in prison without the possibility of parole. In the *Kelly* decision, the court explained that the trial court's obligation to supply such an instruction does not depend upon whether the jury asked questions or manifested confusion on the subject. In other words, the court had a duty to so instruct the jury on its own motion. (*Kelly v. South Carolina, supra,* 534 U.S. at p. 256.) The high court, however, certainly did not proclaim that courts have a duty to instruct on their own motion as proposed by defendant when, reflecting state law, the pattern instruction *already* informs the jury of the defendant's ineligibility for parole. As we have explained, unlike the situation in South Carolina, the California pattern instruction itself adequately informs the jury. (*People v. Prieto, supra,* 30 Cal.4th at pp. 270–271.) We therefore reject defendant's claim that the trial court erred in failing to instruct the jury on the meaning of life imprisonment without the possibility of parole and, for the reasons discussed in the cases cited above, we also reject his claim that failure to so instruct the jury constituted a violation of his right to due process of law, to a fair trial, and to a reliable penalty determination. (*People v. Smithey* (1999) 20 Cal.4th 936,

---

[35] Defendant contends the instruction he requested did not call upon the jury to assume the punishment *inexorably* would be carried out, thereby distinguishing it from our prior cases. The instruction defendant requested was basically identical to the one we criticized in *People v. Smith, supra,* 30 Cal.4th 581, however.

1010 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [rejecting a similar claim based upon due process and 8th Amend. concerns]; *People v. Roybal* (1998) 19 Cal.4th 481, 525, fn. 16 [79 Cal.Rptr.2d 487, 966 P.2d 521] [rejecting a similar claim that such asserted instructional error violated the defendant's rights under the U.S. Const., 5th, 8th & 14th Amends.].)

### 3. *Challenges to the Death Penalty Law*

Defendant contends that several features of California's capital sentencing scheme, alone or in combination, violate the federal Constitution. We previously have rejected similar challenges, and because defendant has not presented a persuasive reason for us to reconsider those rulings, we decline to do so.

The sentencing guidelines set forth in section 190.3 sufficiently narrow the class of homicide offenders who are eligible for the death penalty. (*People v. Tafoya* (2007) 42 Cal.4th 147, 197 [64 Cal.Rptr.3d 163, 164 P.3d 590]; *People v. Manriquez* (2005) 37 Cal.4th 547, 589 [36 Cal.Rptr.3d 340, 123 P.3d 614]; *People v. Michaels* (2002) 28 Cal.4th 486, 541 [122 Cal.Rptr.2d 285, 49 P.3d 1032].) Section 190.3, factor (a) is not overbroad on its face or as applied (*People v. Robinson* (2005) 37 Cal.4th 592, 655 [36 Cal.Rptr.3d 760, 124 P.3d 363]), nor does it allow for the arbitrary and capricious imposition of the death penalty. (*Ibid.*; *People v. Manriquez, supra*, 37 Cal.4th at p. 589; *People v. Carter* (2005) 36 Cal.4th 1215, 1278 [32 Cal.Rptr.3d 838, 117 P.3d 544]; *People v. Morrison* (2004) 34 Cal.4th 698, 730–731 [21 Cal.Rptr.3d 682, 101 P.3d 568]; *People v. Jenkins* (2000) 22 Cal.4th 900, 1050–1053 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

California's capital sentencing scheme as a whole provides adequate safeguards against the imposition of arbitrary or unreliable death judgments. (See *People v. Ray* (1996) 13 Cal.4th 313, 360 [52 Cal.Rptr.2d 296, 914 P.2d 846]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 777–779 [230 Cal.Rptr. 667, 726 P.2d 113].) Nothing in the federal Constitution requires the penalty phase jury to (1) make written findings of the factors it finds in aggravation and mitigation (*People v. Manriquez, supra*, 37 Cal.4th at p. 590; *People v. Maury* (2003) 30 Cal.4th 342, 440 [133 Cal.Rptr.2d 561, 68 P.3d 1]); (2) agree unanimously that a particular aggravating circumstance exists (*People v. Tafoya, supra*, 42 Cal.4th at p. 197; *People v. Manriquez, supra*, 37 Cal.4th at p. 590); (3) find all aggravating factors proved beyond a reasonable doubt or by a preponderance of the evidence (*People v. Tafoya, supra*, 42 Cal.4th at p. 197; *People v. Manriquez, supra*, 37 Cal.4th at p. 589; *People v. Welch* (1999) 20 Cal.4th 701, 767 [85 Cal.Rptr.2d 203, 976 P.2d 754]); (4) find that

aggravation outweighs mitigation beyond a reasonable doubt (*People v. Manriquez, supra,* 37 Cal.4th at p. 589; *People v. Welch, supra,* 20 Cal.4th at p. 767); or (5) conclude beyond a reasonable doubt that death is the appropriate penalty. (*People v. Manriquez, supra,* 37 Cal.4th at p. 589; *People v. Holt* (1997) 15 Cal.4th 619, 683 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

"Nor is the trial court required to instruct as to standard of proof. [Citations.] Here, the jury was instructed that '[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without possibility of parole.' That is sufficient. [Citations.] 'Unlike the guilt determination, "the sentencing function is inherently moral and normative, not factual" [citation] and, hence, not susceptible to a burden-of-proof quantification.' [Citation.] The United States Supreme Court decisions rendered in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] do not compel a different conclusion. [Citations.]" (*People v. Manriquez, supra,* 37 Cal.4th at p. 589 [discussing a jury instruction virtually identical to that given here]; see also *People v. Stevens* (2007) 41 Cal.4th 182, 212 [59 Cal.Rptr.3d 196, 158 P.3d 763] [rejecting similar claim based upon *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; *People v. Prince, supra,* 40 Cal.4th at pp. 1297–1298 [same]; *People v. Welch, supra,* 20 Cal.4th at p. 767.)

Intercase proportionality review is not required. (*People v. Tafoya, supra,* 42 Cal.4th at p. 197; *People v. Welch, supra,* 20 Cal.4th 701.) Consideration during the penalty phase of unadjudicated criminal activity is permissible. (*People v. Manriquez, supra,* 37 Cal.4th at p. 590; *People v. Brown* (2004) 33 Cal.4th 382, 402 [15 Cal.Rptr.3d 624, 93 P.3d 244]; *People v. Prieto, supra,* 30 Cal.4th at p. 276; *People v. Kipp* (2001) 26 Cal.4th 1100, 1138 [113 Cal.Rptr.2d 27, 33 P.3d 450].)

Section 190.3, factors (d) ("extreme . . . emotional disturbance") and (g) ("extreme duress or [acting] under the substantial domination of another person") are not impermissibly vague on the ground they require a subjective determination of the meaning of the words "extreme" and "substantial," nor do they act as a barrier to consideration of evidence in mitigation. (*People v. Tafoya, supra,* 42 Cal.4th at pp. 197–198; *People v. Arias* (1996) 13 Cal.4th 92, 188–189 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People v. Stanley, supra,* 10 Cal.4th 764, 842; *People v. Clark* (1992) 3 Cal.4th 41, 163 [10 Cal.Rptr.2d 554, 833 P.2d 561].)

The trial court did not err in failing to label the sentencing factors as aggravating or mitigating, and such factors are not unconstitutional simply because they do not specify which are aggravating and which are mitigating. (*People v. Carey* (2007) 41 Cal.4th 109, 137 [59 Cal.Rptr.3d 172, 158 P.3d 743]; *People v. Williams* (1997) 16 Cal.4th 153, 269 [66 Cal.Rptr.2d 123, 940 P.2d 710]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1383 [65 Cal.Rptr.2d 145, 939 P.2d 259]; *People v. Samayoa* (1997) 15 Cal.4th 795, 862 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

California's capital sentencing procedures do not violate principles of equal protection of the law on the ground they provide safeguards different from those found in noncapital cases. (*People v. Stevens, supra,* 41 Cal.4th at p. 212; *People v. Carey, supra,* 41 Cal.4th at p. 136; *People v. Ramos* (1997) 15 Cal.4th 1133 [64 Cal.Rptr.2d 892, 938 P.2d 950]; *People v. Cox* (1991) 53 Cal.3d 618, 691 [280 Cal.Rptr. 692, 809 P.2d 351].)

Finally, "[w]e reject defendant's argument that the death penalty statute is contrary to international norms of humanity and decency . . . . Defendant points to no authority that 'prohibit[s] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements.'" (*People v. Stevens, supra,* 41 Cal.4th at p. 213; see also *People v. Moon* (2005) 37 Cal.4th 1, 47–48 [32 Cal.Rptr.3d 894, 117 P.3d 591].) In view of his failure to establish that his trial was not conducted in accordance with state or federal constitutional law, defendant also fails to establish a violation of international law. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 513 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

## C. ASSERTED CUMULATIVE ERROR

Defendant contends the cumulative effect of the asserted errors committed at the guilt and penalty phases of his trial led to a miscarriage of justice and constituted structural error in the trial, requiring reversal of the guilt and penalty phase judgments. He claims errors rendered the trial fundamentally unfair and deprived him of his rights to due process of law, a fair jury trial, and a reliable penalty determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Having determined that defendant's trial was virtually free of error, and that, to the extent error was committed, it was harmless, we conclude there is no merit in his claims of cumulative error, including his claim that the cumulative impact of error lightened the prosecution's burden of proof.

## III. CONCLUSION

We affirm the judgment in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied June 11, 2008.